# EXHIBIT 3





YASIN M. ALMADANI, ESQ.
4695 MACARTHUR CT., STE. 1100
NEWPORT BEACH, CA 92660
TEL: (949) 877-7177
YMA@LAWALM.COM

AHMED IBRAHIM, ESQ.
4695 MACARTHUR CT., STE. 1100
NEWPORT BEACH, CA 92660
TEL: (949) 266-1240
AIbrahim@AILawFirm.com

Date: March 25, 2024  |  *Via E-Mail (elsubpoenas@meta.com) and Overnight Mail*

Meta Platforms, Inc.
1 Meta Way
Menlo Park, CA 94025

RE:     *Porter, et al. v. County of Solano, et al.*, No. 2:21-cv-01473-KJM-JDP (E.D. Cal.)
          Civil Records Subpoena

Attn: Meta Platforms,

      This letter is being sent to you with regards to the civil records subpoena duly served on Meta Platforms, Inc. ("Meta") on February 13, 2024 in connection with the above-referenced matter.  For your convenient reference, a copy of the subpoena and proof of service is enclosed herewith as Exhibit A.

      We are in receipt of Meta's auto-generated form objections to the subpoena.  After serving the subpoena and receiving the automated reply, Array, our designated agent handling compliance with the subpoena, has made numerous efforts to contact a live person regarding the subpoena, but was unable to locate anyone.

      Accordingly, we are sending this letter in an effort to meet and confer regarding Meta's objections and the need for us to promptly move for an order compelling compliance with the subpoena.

      By way of background, this is a civil rights action against Solano County and its Sheriff's Office, as well as individual officers, arising out of constitutional and state violations for excessive force, false arrest, unlawful search and seizure, and violations of equal protection.  The case concerns Nakia Porter, a 5-foot, 2-inch, 125-pound African American Intel software engineer at the time in her thirties who was beaten unconscious by Solano County deputies when she pulled over off an exit off the 80 freeway in the City of Dixon with her toddlers on the night of August 6, 2020, to switch drivers with her 60-year old father.  Ms. Porter had committed no crime.  Nevertheless, she was arrested after being beaten, but all charges were dropped as it was readily observable from the body cam and dash cam videos that she had done nothing wrong and that the County Sheriff's deputies were the aggressors with no legal justification for taking the actions they did.  The deputies also put Ms. Porter's elderly father in handcuffs and put him in the back of another police car for no reason, leaving Ms. Porter's two daughters (6 and 4 at the time) and her niece (3 years old) alone in the back seat during the County's infliction of terror on this innocent family.  Attached hereto as Exhibit B is a copy of the operative complaint in this matter.





Re:     *Porter v. County of Solano, et al.*
Date:   March 25, 2024
Page:   2

The subpoena at issue pertains to the social media accounts of Roy Stockton, a sergeant with the Solano County Sheriff's Office. Pursuant to the operative complaint, Sergeant Stockton knowingly and willfully approved falsified police reports and authored his own falsified police report to have Ms. Porter prosecuted, as well as protect the two deputies who physically assaulted Ms. Porter (Deputies Dalton McCampbell and Lisa McDowell) from discipline and prosecution.

Sergeant Stockton's biases, credibility, and ability to uphold his oath of office are squarely at issue in this litigation. The evidence from social media postings, including those advertising his online store, that were once public confirm Sergeant Stockton's involvement in and support of the Three Percenter movement — an antigovernment group whose members and affiliates espouse racist ideologies and which was founded in response to the presidency of President Barack Obama. This is highly relevant to Plaintiffs' claims, which, among others, include an equal protection claim and a Ralph Civil Rights Act claim for violence against Plaintiffs on account of their race, color, and ancestry, as well as excessive force and falsification of evidence claims. (Exhibit B at ¶¶ 119-125, 136-143.)

Specifically, Sergeant Stockton received a gift from his friend and fellow law enforcement officer (Cully Pratt) of a gun rack containing the Three-Percenter symbol surrounded by shotgun shells similar to confederate flags, with an AR-15 on the rack and the words "Will Not Comply." (Exhibit D.). The social media post where this gift was displayed contained, among other hashtags, the following: "#willnotcomply," "#livefreeordie," "#3percenter," and "#blackgunsmatter." Sergeant Stockton proudly hung this anti-government/racist gun rack in his garage.

Sergeant Stockton also made and sold leather goods containing the Three Percenter symbol on his online store called "High Brass Leather." (Exhibit E ("Leather items for your pocket.") The Instagram account for his online store called High Brass Leather, containing relevant posts, photos, videos and comments was mysteriously taken private after the lawsuit was filed. (*Id.*)

On November 7, 2016, Sergeant Stockton reposted a collage of highly threatening guns, including numerous glocks and assault rifles, on his Facebook account "live_free_edc," with the message "Getting ready for the election tomorrow [emojis]. Still mind-boggling that Hillary is not in jail. Just remember when you go vote '13 hours' [U.S. flag emoji]." (Exhibit F.) The post contained several hashtags of the names of guns, #donttreadonme, and @thepatriotmilitia.

To make matters worse, when we asked Sergeant Stockton about these posts and his unmistakable support and knowledge of the Three Percenter movement, Sergeant Stockton perjured himself by refusing to provide honest answers—instead pretending he knew nothing despite the overwhelming objective evidence implicating him with this highly dangerous anti-government movement with members espousing white supremacist views and whose members were implicated in the January 6, 2020, insurrection at the Capitol to overthrow the government.



ALMADANI LAW



Re:     *Porter v. County of Solano, et al.*
Date:   March 25, 2024
Page:   3

In short, the point is that contrary to the automated objections we received from Meta, the records sought pursuant to the subpoena are highly relevant to the claims in this case and concern posts that were public.

We also want to be very clear that we are not asking Meta to produce private communications or postings and, therefore, there is no basis for any objection that Meta is legally precluded from producing the records under the Stored Communications Act (SCA). We are willing to limit the scope of Request Nos. 1 and 3 of our subpoena to cover only those materials that were publicly available on the Facebook and Instagram accounts with the usernames "live_free_edc" and "highbrassleather." Such publicly available materials are not protected by any rights or privacy or statutory protections under the SCA. *See Facebook, Inc. v. Superior Court*, 4 Cal. 5th 1245, 1274 (2018) (concluding that "communications configured by a social media user to be public fall within section 2702(b)(3)'s lawful consent exception, presumptively permitting disclosure by a provider."); 18 U.S.C. § 2511(2)(g) ("It shall not be unlawful under [the SCA] for any person ... to intercept or access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public")

Finally, Plaintiffs have been unable to obtain all requested discovery directly from Mr. Stockton. Plaintiffs propounded a formal request for production of document upon Mr. Stockton seeking the following:

> For the period of ten years preceding the INCIDENT on August 6, 2020, through the present date, all DOCUMENTS, including e-mails and social media messages and postings, relating to all social, political, militant, pro-gun rights, patriotic, American nationalist, fascist, racist, white supremacist, or white nationalist organizations, clubs, associations, or groups that YOU belong/belonged to, are/were affiliated with, or attended meetings of. Examples of such organizations, clubs, associations, or groups in this [Request] includes, but is not limited to, Proud Boys, Oath Keepers, Three Percenters, Constitutional Sheriffs, Boogaloo Movement, National Rifle Association, and the Ku Klux Klan.

(*See* Exhibit C.) Mr. Stockton provided a verified response to this request indicating he is producing "all responsive documents in his possession, custody, and control." (*Id.*)

However, although Mr. Stockton produced a modicum of his Facebook and Instagram posts, it is clear that many of the responsive postings were omitted from the production. For example, none of the postings Stockton was confronted with at his depositions—which were available from public articles—were a part of Stockton's production.





Re:    *Porter v. County of Solano, et al.*
Date:   March 25, 2024
Page:   4


There is also no valid argument that the requested records are private. Several news articles reported on Mr. Stockton's public social media activity. (*See, e.g.,* Exhibit G.) None of the social media postings discussed in these articles were provided by Mr. Stockton. And, as noted, further efforts to obtain documents from him directly would be futile in light of his verified response confirming, under penalty of perjury, that he has produced all documents in his possession, custody, or control. He chose to do this despite the existence of these materials and others he was confronted with at his deposition—none of which were included in his production.

Accordingly, we believe Meta has an obligation to comply with our subpoena as clarified by this letter. We would like to schedule a call with a Meta representative as soon as possible to meet and confer regarding the subpoena. Please be advised, however, that the discovery cutoff in this case is April 8, 2024. For this reason, if we are unable to resolve any disputes concerning this subpoena by Monday, April 1, at the latest, we will have no choice but to immediately prepare and file a motion to compel compliance with the subpoena. It is important, therefore, we receive a phone call from one of your representatives with authority to discuss the subpoena as soon as possible.

We look forward to hearing from you and sincerely hope we can resolve this without involving the Court.

Sincerely,

*Yasin M. Almadani, Esq.*

*Ahmed Ibrahim Esq.*

Enclosures

Cc:    *Gregory Fox, Esq. (via e-mail)*

# EXHIBIT A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| Nakia V. Porter, et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 2:21-CV-01473-KJM-JDP |
| County of Solano, et al. | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Custodian of Records, Meta Platforms, Inc., Corporation Service Company Which Will Do Business in California as CSC - Lawyers Incorporating Service, c/o Becky DeGeorge, Lai Saevang, or any other person authorized to accept service of process on behalf of CSC

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: All documents and electronically stored information described in Exhibit A. Plaintiffs request the materials be produced in electronic form to aibrahim@ailawfirm.com and be authenticated by the custodian of records of your organization, or alternatively, to the company listed below, by completing the declaration attached as Exhibit B.

| Place: Array 926 Industrial Avenue Palo Alto, CA 94303 | Date and Time: February 22, 2024, 10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: February 12, 2024

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiffs Nakia V. Porter, L.P., A.P., O.P., and Joe Berry Powell, Jr. , who issues or requests this subpoena, are: Ahmed Ibrahim, Esq., AI Law, PLC, 4695 MacArthur Court, Suite 1100, Newport Beach, CA 92660, aibrahim@ailawfirm.com, 949-266-1240.

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:21-CV-01473-KJM-JDP

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____                    _____

                                                        *Server's signature*

                                            _____

                                                        *Printed name and title*

                                            _____

                                                        *Server's address*

Additional information regarding attempted service, etc.:

| Print | Save As... | Add Attachment | | Reset |

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

<u>**EXHIBIT A**</u>

<u>**DOCUMENTS AND ELECTRONICALLY STORED INFORMATION TO BE
PRODUCED**</u>

1.     All photos, videos, posts, comments, articles, and other content posted on the Facebook account of username "live_free_edc" from January 1, 2008 to the present.

2.     All information sufficient to specify the date on which the Facebook account of username "live_free_edc" went private.

3.     All photos, videos, posts, comments, articles, and other content posted on the Instagram account of username "highbrassleather" from January 1, 2008 to the present.

4.     All information sufficient to specify the date on which the Instagram account of username "highbrassleather" went private.

**EXHIBIT B**

**CERTIFICATION OF AUTHENTICITY**

**Pursuant to Rules 803(6) and 901 of the Federal Rules of Evidence**

The undersigned declarant hereby declares, certifies, verifies, or states under penalty of perjury under the laws of the United States of America the following:

1.      The declarant is a records custodian or other qualified person who can provide a written declaration regarding the records of regularly conducted business activity which are the subject of this certification;

2.      The records of regularly conducted business activity (hereinafter "records") which are the subject of this certification are numbered/Bates stamped;

3.      The records are originals or duplicate copies of domestic (United States) business records, which are true and correct copies of the original records prepared and/or maintained by Meta Platforms, Inc., which own and operate Facebook and Instagram;

4.      The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

5.      The records were kept in the course of a regularly conducted business activity; and

6.      The records were made as a regular practice in the course of regularly conducted business activity.

I hereby declare, certify, or state, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on _____ (date).


_____
Signature of Declarant

_____
Printed Name

_____
Title

_____
Address

_____
Telephone No.

Yasin M. Almadani (Cal. Bar No. 242798)
ALMADANI LAW
4695 MacArthur Ct., Suite 1100
Newport Beach, CA 92660
Tel:  (949) 877-7177
Fax:  (949) 877-8757
YMA@LawAlm.com

Ahmed Ibrahim (Cal. Bar No. 238739)
AI LAW, PLC
4695 MacArthur Ct., Suite 1100
Newport Beach, CA 92660
Tel:  (949) 266-1240
Fax:  (949) 266-1280
aibrahim@ailawfirm.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAKIA V. PORTER, an individual on her own behalf and on behalf of her minor children, L.P. and A.P.; JOE BERRY POWELL, JR., an individual; and CLIFTON POWELL, on behalf of his minor child, O.P., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SOLANO; SOLANO COUNTY SHERIFF'S OFFICE; SHERIFF THOMAS A. FERRARA, in his official capacity as Sheriff of Solano County; DEPUTY DALTON MCCAMPBELL, an individual; DEPUTY LISA MCDOWELL, an individual; SERGEANT ROY STOCKTON, an individual; DEPUTY CONNOR HAMILTON, an individual; DEPUTY CHRIS CARTER, an individual; CITY OF DIXON; DIXON POLICE DEPARTMENT; DIXON POLICE CHIEF ROBERT THOMPSON, in his official capacity as Dixon Chief of Police; OFFICER GABRIEL HOLLINGHEAD, an individual, OFFICER AARON WILLIAMS, an individual, and DOES 1 to 10, inclusive, <br><br> Defendants. | Case No. 2:21-cv-01473-KJM-JDP <br><br> **PROOF OF SERVICE ON DEFENSE COUNSEL OF SUBPOENA FOR RECORDS TO META PLATFORMS, INC.** <br><br> Hon. Kimberly J. Mueller <br> Chief United States District Judge |

1

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my address is 4695 MacArthur Court, Suite 1100, Newport Beach, CA 92660.  On February 12, 2024, I served the foregoing documents described as **SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION RE:  META PLATFORMS, INC.** on the following persons in the manner described below:

> Danielle K. Lewis, Esq.
> dlewis@hpylaw.com
> Miles F. Maurino, Esq.
> mmaurino@hpylaw.com
> HAWKINS PARNELL & YOUNG
> 33 New Montgomery, Suite 800
> San Francisco, CA 94105
> Telephone:  (415) 766-3200
> Facsimile:  (415) 766-3250
>
> Attorneys for Defendants County of
> Solano, Sheriff Thomas A. Ferrara,
> Dalton McCampbell, Lisa McDowell,
> Roy Stockton, Connor Hamilton, and
> Chris Carter

☐  BY REGULAR MAIL:  I caused such envelopes to be deposited in the United States mail, with postage thereon fully prepaid.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the United States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to  (Fed. R. Civ. P. 5(b)(2)(C); C.C.P. § 1013(a)).

☐  BY OVERNITE EXPRESS:  I caused such envelopes to be delivered by air courier, with next day service, to the offices of the addressees. (Fed. R. Civ. P. 5(b)(2)(C); C.C.P. § 1013(c)(d)).

☐  BY PERSONAL SERVICE:  I caused such envelopes to be delivered by hand to the offices of the addressees. (Fed. R. Civ. P. 5(b)(2)(A); C.C.P. § 1011(a)(b)).

☒  BY E-MAIL OR ELECTRONIC TRANSMISSION:  I caused such documents to be e-mailed from aibrahim@ailawfirm.com to the e-mail addresses listed on the service list above.  I did not receive any electronic message or indication that the transmission was unsuccessful.  (Fed R. Civ. P. 5(b)(2)(E); C.C.P. § 1010.6)

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.  Executed on February 12, 2024

_____

Ahmed Ibrahim

2

AO 88B (rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:21-CV-01473-KJM-JDP

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45)*

This subpoena for *(name of inidividual and title, if any)* Meta Platforms, Inc.

was received by me on *(date)* 2/12/2024

☒ I served the subpoena by delivering a copy to the named person as follows: Nicole Stauss / Meta Platforms, Inc.   on (date) 2/13/2024  ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ $15.00

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: 2/13/2024

_____
*Server's Signature*

Michael Van Hooser, Array
_____
*Printed name and title*

18013 Sky Park Circle, Suite C
Irvine, CA 92614
_____
*Server's address*

Additional information regarding attempted service, etc.

**Ref Number 44257-01**

# EXHIBIT B

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALMADANI LAW
Yasin M. Almadani (SBN 242798)
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757
yma@lawalm.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| NAKIA V. PORTER, an individual on her own behalf and on behalf of her minor children, L.P. and A.P.; JOE BERRY POWELL, JR., an individual; and CLIFTON POWELL, on behalf of his minor child, O.P., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SOLANO; SOLANO COUNTY SHERIFF'S OFFICE; SHERIFF THOMAS A. FERRARA, in his official capacity as Sheriff of Solano County; DEPUTY DALTON MCCAMPBELL, an individual; DEPUTY LISA MCDOWELL, an individual; SERGEANT ROY STOCKTON, an individual; DEPUTY CONNOR HAMILTON, an individual; DEPUTY CHRIS CARTER, an individual; CITY OF DIXON; DIXON POLICE DEPARTMENT; DIXON POLICE CHIEF ROBERT THOMPSON, in his official capacity as Dixon Chief of Police; OFFICER GABRIEL HOLLINGSHEAD, an individual, OFFICER AARON WILLIAMS, an individual, and DOES 1 to 10, inclusive, <br><br> Defendants. | Case No. 2:21-CV-01473-KJM-JDP <br><br> **SECOND AMENDED CIVIL RIGHTS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs NAKIA V. PORTER, on behalf of herself and her two minor natural daughters L.P. and A.P., JOE BERRY POWELL, JR. (Ms. Porter's father), on behalf of himself, and CLIFTON POWELL (Ms. Porter's brother), on behalf of his minor natural daughter O.P., (collectively, "Plaintiffs"), bring this action demanding a jury trial against Defendants COUNTY OF SOLANO, SOLANO COUNTY SHERIFF'S OFFICE, SHERIFF THOMAS A. FERRARA, in his official capacity as Sheriff of Solano County, Sheriff's DEPUTY DALTON MCCAMPBELL, an individual, Sheriff's DEPUTY LISA MCDOWELL, an individual, Sheriff's SERGEANT ROY STOCKTON, an individual, Sheriff's DEPUTY CONNOR HAMILTON, an individual, Sheriff's DEPUTY CHRIS CARTER, an individual, the CITY OF DIXON, the DIXON POLICE DEPARTMENT, DIXON POLICE CHIEF ROBERT THOMPSON, in his official capacity as the Dixon Chief of Police, Dixon Police OFFICER GABRIEL HOLLINGSHEAD, an individual, Dixon Police OFFICER AARON WILLIAMS, an individual, and DOES 1 to 10, inclusive, (collectively, "Defendants") for violations of Plaintiffs' constitutional and civil rights.  Plaintiffs allege the following based upon personal knowledge and information and belief:

# I.    NATURE OF THE ACTION

1.    On August 6, 2020, Defendants Dalton McCampbell and Lisa McDowell, who are Solano County Sheriff's deputies, without cause and in violation of clear statutory and constitutional law, arrested and assaulted Ms. Nakia Porter, and then brutally beat her unconscious in the presence of her father, Mr. Joe Berry Powell, Jr., and three children—her two daughters, L.P (age 6 at the time) and A.P. (age 4 at the time), and her niece, O.P. (age 3 at the time). After tossing Ms. Porter in the back of a Dixon Police vehicle, unconscious, the same Defendants, along with the other Defendants, proceeded to handcuff and falsely imprison Mr. Powell in the back of another law enforcement vehicle. After unlawfully imprisoning Ms. Porter and Mr. Powell in law enforcement vehicles, Defendants then approached Ms. Porter's car with the three small children left alone inside—the Deputies had their guns drawn at the car frightening the

**SECOND AMENDED COMPLAINT**

children even further—and started searching the car with no probable cause to do so. The illegal seizure of Mr. Powell and the children and illegal search of the vehicle persisted for approximately an hour. Ms. Porter and Mr. Powell were detained in separate Sheriff's vehicles equipped with cages while the children were detained in Ms. Porter's vehicle, scared in the dark without their caretakers as the Sheriff's Deputies repeatedly shined flashlights in their faces and illegally searched the vehicle, ultimately finding no evidence of a crime whatsoever. Nevertheless, the Sheriff's Office arrested Mr. Porter, booked her into jail, and submitted falsified evidence to have her prosecuted. The District Attorney declined to prosecute her.

2.      The extreme violence Defendants inflicted upon Plaintiffs—three innocent generations of African Americans—truly shocks the conscience. This lawsuit seeks to vindicate Plaintiffs' rights.

## II.     <u>JURISDICTION AND VENUE</u>

3.      This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), as well as Article III of the U.S. Constitution. Supplemental jurisdiction over state law claims is proper under 28 U.S.C. § 1367 because all claims arise from a common nucleus of operative facts that are so intertwined that they cannot be reasonably separated.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in and can be found in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within the County of Solano, State of California, within the Eastern District of California.

## III.    <u>PARTIES</u>

### A.     **Plaintiffs**

5.      Plaintiff NAKIA V. PORTER ("Ms. Porter") is a 33-year-old, Black woman who resides in Sacramento County, California. Ms. Porter is a natural parent and legal guardian of minors L.P. and A.P. who reside with her.

6.      Ms. Porter is an accomplished software engineer at one of the leading

**SECOND AMENDED COMPLAINT**

semiconductor companies in the world, a mother of three children under seven years old, a dance instructor, and a motivational speaker. She holds bachelor's and master's degrees in computer science from North Carolina A&T State University, a top-ten Historically Black College & University where she graduated *summa cum laude*, was awarded the Cyber Corps Scholarship for Service, and served as Co-President of the Association of Computing Machinery. She was also a Step Team member of the National Society of Black Engineers.

7.      Ms. Porter graduated with a published thesis entitled, "Introduction of Cloud Computing into the Computer Science Curriculum," which serves as curriculum material at North Carolina A&T State University. She also served as a Cyber Analyst at Johns Hopkins University's Applied Physics Laboratory ("JHUAPL"), one of the nation's largest university-affiliated research centers. Ms. Porter contributed to the Laboratory's work on cyber security, identity management security, and data privacy, and served as a coordinator for JHUAPL's ATLAS Program, which provides opportunities to minority students. In addition, Ms. Porter has interned for the U.S. Department of Energy and Naval Sea Systems Command in Washington, D.C., the largest of the U.S. Navy's five-system commands.

8.      Beyond her accomplishments in computer science, Ms. Porter is an accomplished athlete, musician, and community leader. She was a Mid-Eastern Atlantic Conference Championship cheerleader and now teaches dance and gymnastics to young children in Northern California. She also plays the cello, consistently volunteers her time at community events, and is often asked to give motivational talks.

9.      Ms. Porter is five (5) feet, two (2) inches tall, and weighs 125 pounds.

10.      Plaintiff JOE BERRY POWELL, JR. ("Mr. Powell") is Ms. Porter's father. He is a 61-year-old, Black man and resident of Orangevale, California. He is an accomplished computer operations manager. Prior to retiring and starting his own computer media company, Mr. Powell worked for almost 30 years in computer operations, networking, and database management, including working for NAVAIR,

**SECOND AMENDED COMPLAINT**

which is one of the Echelon II Navy systems commands providing support for aircraft and airborne weapon systems for the U.S. Navy. Mr. Powell is the proud grandfather of six children.

11.     Plaintiff, L.P., is Ms. Porter's minor daughter who was six years old at the time of the unlawful conduct alleged herein. L.P. resides with her mother and father in Sacramento County. Ms. Porter, L.P.'s natural mother and legal general guardian, sues on behalf of L.P., as well as on her own behalf, under Fed. R. Civ. P. 17(a) and (c).

12.     Plaintiff, A.P., is Ms. Porter's minor daughter who was four years old at the time of the unlawful conduct alleged herein. A.P. resides with her mother and father in Sacramento County. Ms. Porter, A.P.'s natural mother and legal general guardian, sues on behalf of L.P., as well as on her own behalf, under Fed. R. Civ. P. 17(a) and (c).

13.     Plaintiff, O.P., is Ms. Porter's minor niece who was three years old at the time of the unlawful conduct alleged herein. O.P. resides with her mother and father in Sacramento County. O.P.'s natural father and legal guardian, Mr. Clifton Powell, brings this suit on her behalf.

14.     Plaintiffs L.P., A.P., and O.P. are collectively referred to herein as the "Children." All Plaintiffs are collectively referred to herein as "Plaintiffs."

**B.     Defendants**

15.     Defendant COUNTY OF SOLANO (the "County" or "Solano County") is a public entity and political subdivision duly organized and existing under the laws of the State of California. The County has a clear and present duty to follow California and United States law. *See, e.g.,* Cal. Const. Art. III § 3.5.  Upon information and belief, the County, through its Board of Supervisors, oversees the Solano County Sheriff's Office. The County is sued on the basis of *respondeat superior* under California Government Code Section 815.2 ("Cal. Gov. Code § 815.2").

16.     Defendant SOLANO COUNTY SHERIFF'S OFFICE (the "SCSO" or "Sheriff's Office") is a public entity and law enforcement agency operating in Solano County, California. Solano County Sheriff THOMAS A. FERRARA is being sued in his

official capacity as Sheriff of Solano County. The SCSO and Sheriff Ferrara have a clear

and present duty to follow California and United States law. *See, e.g.*, California Const.

Art. III § 3.5. Defendants SCSO and Sheriff Ferrara are sued on the basis of *respondeat*

*superior* under Cal. Gov. Code § 815.2.

17.    Defendant DALTON MCCAMPBELL ("McCampbell") is a male SCSO

deputy and employee of Solano County and/or the Sheriff's Office sued in his individual

capacity. Deputy McCampbell appears to be White. Deputy McCampbell, along with the

other Defendants, unlawfully arrested, assaulted, detained, illegally searched, and

terrorized Ms. Porter, Mr. Powell, and the Children, and fabricated false charges against

Ms. Porter to have her prosecuted, all in violation of Plaintiffs' constitutional rights and

other legal protections.

18.    Defendant LISA MCDOWELL ("McDowell") is a female SCSO deputy and

employee of Solano County and/or the Sheriff's Office sued in her individual capacity.

Deputy McDowell appears to be White. Deputy McDowell, along with the other

Defendants, unlawfully arrested, assaulted, detained, illegally searched, and terrorized

Ms. Porter, Mr. Powell, and the Children, and fabricated false charges against Ms. Porter

to have her prosecuted, all in violation of Plaintiffs' constitutional rights and other legal

protections.

19.    Defendant ROY STOCKTON ("Sergeant Stockton") is a male SCSO

sergeant and employee of Solano County and/or the Sheriff's Office sued in his

individual capacity. Sergeant Stockton appears to be White and a member of or otherwise

affiliated with the extremist group The Three Percenters, whose members have espoused

antigovernment and racist rhetoric. Sergeant Stockton, acting on authority of the SCSO,

supervised Deputies McCampbell and McDowell in connection with this case. Sergeant

Stockton oversaw the illegal seizure and search and prolonged detention of Plaintiffs and

their vehicle. He also knowingly approved Deputies McCampbell and McDowell's

falsified reports so that the reports could be submitted to the Solano County District

Attorney's Office to have Ms. Porter prosecuted on false charges and cover up the

Defendant Deputies' unlawful acts.

20.     Defendant CONNOR HAMILTON ("Hamilton"), an individual, is a male SCSO deputy and employee of Solano County and/or the Sheriff's Office sued in his individual capacity. Deputy Hamilton, along with the other Defendants, unlawfully arrested, assaulted, detained, illegally searched, and terrorized Ms. Porter, Mr. Powell, and the Children, all in violation of Plaintiffs' constitutional rights and other legal protections.

21.     Defendant CHRIS CARTER ("Carter") is a male SCSO deputy and employee of the County and/or Sheriff's Office sued in his individual capacity. Deputy Carter, along with the other Defendants, unlawfully arrested, assaulted, detained, illegally searched, and terrorized Ms. Porter, Mr. Powell, and the Children, all in violation of Plaintiffs' constitutional rights and other legal protections.

22.     Defendant CITY OF DIXON (the "Dixon") is a public entity and political subdivision duly organized and existing under the laws of the State of California. Dixon has a clear and present duty to follow California and United States law. *See, e.g.*, Cal. Const. Art. III § 3.5.  Upon information and belief, Dixon oversees the Dixon Police Department. Dixon is sued on the basis of *respondeat superior* under Cal. Gov. Code § 815.2.

23.     Defendant DIXON POLICE DEPARTMENT (the "Dixon PD") is a public entity and law enforcement agency operating in Solano County, California. Dixon Police Chief ROBERT THOMPSON is being sued in his official capacity as Dixon Chief of Police. Defendants Dixon PD and Chief Thompson have a clear and present duty to follow California and United States law. *See, e.g.*, California Const. Art. III § 3.5. Defendants Dixon PD and Chief Thompson are sued on the basis of *respondeat superior* under Cal. Gov. Code § 815.2.

24.     Defendant GABRIEL HOLLINGSHEAD ("Hollingshead") is a male Dixon Police officer and employee of the City of Dixon and/or the Dixon Police Department sued in his individual capacity. Officer Hollingshead is White. Officer Hollingshead,

**SECOND AMENDED COMPLAINT**

1   along with the other Defendants, unlawfully arrested, assaulted, detained, illegally

2   searched, and terrorized Ms. Porter, Mr. Powell, and the Children, all in violation of

3   Plaintiffs' constitutional rights and other legal protections.

4       25.     Defendant AARON WILLIAMS ("Williams") is a male Dixon Police

5   officer deputy and employee of the City of Dixon and/or the Dixon Police Department

6   sued in his individual capacity. Officer Williams, along with the other Defendants,

7   unlawfully arrested, assaulted, detained, illegally searched, and terrorized Ms. Porter, Mr.

8   Powell, and the Children, all in violation of Plaintiffs' constitutional rights and other

9   legal protections.

10  **IV.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

11      **A.   Constitutional and State Law Violations by the Solano County Sheriff**

12      26.     On August 6, 2020, at approximately 9:00 p.m., Ms. Porter and Mr. Powell

13  (her father) were driving from Oakland, California to their home in Sacramento County.

14  They had gone to Oakland to visit and console Ms. Porter's friend and fellow dance

15  instructor whose student had recently undergone a medical difficulty. Ms. Porter had

16  taken her daughters (A.P. and L.P.) (ages 4 and 6) and niece (O.P.) (age 3) along to visit

17  the Malanga Center in Oakland to learn about the history of African drums, dance, and

18  culture. On the drive back, the occupants in the vehicle were Ms. Porter, Mr. Powell, and

19  the three Children. Ms. Porter is the owner of the vehicle she was driving, which is a

20  Toyota Highlander that was at all relevant times duly registered with the California

21  Department of Motor Vehicles.

22      27.     The distance between Oakland and Orangevale is approximately 106 miles

23  and the drive takes approximately two hours.

24      28.     Ms. Porter had been driving for approximately an hour at night when she

25  decided to let Mr. Powell drive the rest of the way home in order to avoid driver fatigue

26  for her family's and the public's safety. At approximately 9:13 p.m., Ms. Porter took the

27  Midway Road exit off the 80 freeway in Solano County and turned into Chevron Way in

28  Dixon—a dark, small, unpopulated, dead-end road with no traffic. She stopped her

vehicle at a location where it was safe to switch drivers. With no traffic on the street, Ms. Porter—a small woman, 5 feet 2 inches tall, weighing 125 pounds—exited her vehicle and proceeded to walk around to the back of the vehicle to the passenger's side, where Mr. Powell had also opened his door and started to exit the vehicle to switch seats. The three Children remained in the backseat of the car.

29.     The area was dark and neither Ms. Porter nor Mr. Powell realized that there were Sheriff's patrol cars on Chevron Way when they parked the car to switch seats. The patrol car's lights had come on after Ms. Porter had already stopped her vehicle and put the car in park, and she and her father were in the process of exiting their vehicle to switch drivers. In other words, the Defendant Deputies did not initiate any traffic stop. Rather, they simply approached Plaintiffs while Plaintiffs were parked and had begun to switch seats. Ms. Porter was walking towards the rear of her vehicle when she first noticed a Sheriff's patrol car with its lights on. As Ms. Porter reached the back of her vehicle to go around to the passenger's side to switch seats, she noticed a female deputy (Deputy McDowell) saying something to her.

30.     To her knowledge, Ms. Porter had not violated any traffic laws and thereby could not fathom that the deputy intended to stop her for any reason. She also could not believe that the deputy would object to her switching seats with her father, which is advisable from a safety standpoint to avoid driver fatigue. It was unclear to Ms. Porter why the deputy was there. As such, Ms. Porter innocently greeted the deputy, saying, "Hi." Deputy McDowell asked Ms. Porter to "get back in the car." Ms. Porter explained very calmly and respectfully that she was indeed walking to get back in the car switching seats with her father. Deputy McDowell acknowledged this and responded, "Okay. But get back in the car," in a way that indicated to Ms. Porter that she should continue to switch seats and go inside the car. Ms. Porter waved her hand to acknowledge the deputy's request and complied by continuing to walk to the passenger's side to switch seats. Ms. Porter's father also calmly came out of the vehicle to make the switch.

31.     However, at this point, a male deputy (Deputy McCampbell) appeared and

**SECOND AMENDED COMPLAINT**

pointed his gun at Ms. Porter and her car, saying, "Get back in the car now. This is a traffic stop. Get back in the car." Ms. Porter, extremely confused because she had not been stopped for a traffic violation, responded, "Huh?" Ms. Porter then calmly explained to Deputy McCampbell, as she had done so to Deputy McDowell, that she was switching seats with her father and that there were children in the car. Continuing to be confused by the deputies' commands, Ms. Porter explicitly asked if the deputies wanted her to go back to the driver's seat. Deputy McCampbell responded, "Yes, get back in the car." Ms. Porter then immediately began to walk back to the driver's side, and Mr. Powell proceed to get back inside the passenger's seat, in full compliance with the deputies' commands.

32.     Throughout the encounter with the deputies, Ms. Porter, a woman of very small stature, was clearly visible to the deputies. Neither she nor Mr. Powell made any threatening movements at all, and they were clearly not armed or attempting to flee. Ms. Porter had politely explained that they were switching seats and that there were children in the car and had received permission from Deputy McDowell to do so. Ms. Porter and Mr. Powell fully complied with the deputies' commands to get back in the car even though they had not violated any traffic laws to their knowledge.

33.     There was absolutely no cause for Defendants McCampbell and McDowell to put their hands on, arrest, or handcuff Ms. Porter or take her into custody. In fact, the Constitution and California Penal Code Section 853.5(a) explicitly prohibited them from any of this. Nevertheless, as Ms. Porter was walking back to the driver's seat, Deputy McCampbell (the male deputy) unexpectedly yelled, "You know what, detain her!" This was approximately 20 seconds after the initial encounter between Ms. Porter and Deputy McDowell during which Mr. Porter had been given the impression that she could switch seats. As Mr. Powell closed his car door to comply with the command, he explained once again that they were simply switching drivers. The deputies did not care and Deputy McDowell arm-locked Ms. Porter and began to handcuff her to take her into custody without having probable cause to do so in violation of statutory and constitutional law.

34.     Ms. Porter did not understand what was happening and feared for her life

and the lives of her father and children. She had been complying with the deputies'
orders and had not provoked them in any way. Ms. Porter attempted to ask what was
happening, as anyone in her situation would; she did not make any threatening
movements against the deputies or attempt to flee. Instead, she pleaded for her rights to
be read and respected. Despite this, in a show of unjustified, brute force and power,
Defendant McCampbell joined Defendant McDowell, and the two deputies forcibly
pinned Ms. Porter up against her car in front of her father and small children and
handcuffed her, terrorizing an entire family—three African American generations all at
once.

35.     As the deputies engaged in this excessive force and unjustifiably assaulted
and arrested Ms. Porter, body camera footage shows that Ms. Porter had relented to being
handcuffed against her car window with the Children watching in horror, and was only
pleading for her rights at this point. The confusion, panic, and fear in her voice and face
are clear and palpable in the video. At this time, Deputies McDowell and McCampbell
could see that there were little children in the car watching. The deputies did not care.

36.     The pretextual reason they gave for taking Ms. Porter into custody was that
they had possibly noticed a mismatched license plate. But they had no indication of any
crime. Indeed, a mistake or error in the display of license plates is a nonmoving,
noncriminal *infraction* under California Vehicle Code Section 5200 *et seq.* for which "a
peace officer shall *only* require the arrestee to present his or her driver's license or other
satisfactory evidence of his or her identity for examination and to sign a written promise
to appear contained in a notice to appear[.]" Cal. Penal Code § 853.5(a) (emphasis
added). "*Only if* the arrestee refuses to sign a written promise, has no satisfactory
identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken
into custody." *Id.* (emphasis added). As such, even if the Defendant Deputies' pretextual
reason for the arrest was to be believed, clearly established statutory law protected Ms.
Porter's rights, explicitly prohibiting the deputies from putting their hands on her and
taking her into custody.

37.     At that point during the encounter, the Defendant Deputies had already used unreasonable, excessive force and unlawfully taken Ms. Porter into custody without probable cause and in violation of constitutional and statutory law. In other words, if they had left her standing there handcuffed, this would have been a constitutional and statutory violation in and of itself, but they decided to violate the law even further. The deputies dragged Ms. Porter away from her vehicle and outside the view of the Sheriff's patrol car dashboard camera, each large officer grabbing one of her arms as Ms. Porter fearfully pleaded for an explanation, fearing for her life in the wake of the George Floyd homicide. Her father and children helplessly watched in horror.

38.     Outside the view of the dashboard camera, Deputies McCampbell and McDowell—both of whom are much larger than Ms. Porter—brutally beat the mild-mannered, 125-pound, female software engineer and dance teacher to the ground. They repeatedly punched, kicked, kneed, and struck her in the back of the neck, head, face, and stomach, as she struggled and prayed for her life in desperation, pleading, "God, bless me! Bless me, God!"

39.     During the beating, Defendant McCampbell (the male deputy) forced Ms. Porter prone onto her stomach and mounted her while Defendant McDowell, who is a large female deputy, grabbed this African American woman by her long, beautiful braids and shoved her face into the concrete, controlling her by the very braids that Ms. Porter had pridefully grown and groomed over the course of a decade. Ms. Porter gasped for air as her life flashed before her eyes; she thought she was going to die on this abandoned side road wondering what would become of her father, daughters, and niece. She struggled for her life as Deputy McCampbell sat on her with all his weight, screaming, "You're going to get tased!"

40.     Ms. Porter quickly lost consciousness from the severe beating and the weight of the large male deputy. Body-camera footage shows McCampbell's brooding shadow mounted on top of Ms. Porter's tiny frame for approximately one minute even after she had lost consciousness; he appeared to be sitting on her, catching his breath

from the beating he had just delivered. (Later, he would brag to the paramedics, "I had full mount on her.")

41.     Deputy McCampbell then dragged Ms. Porter to Deputy McDowell's Sheriff's vehicle and tossed her inside while she was still unconscious. She was unconscious for over five minutes before waking up inside the Sheriff's vehicle. Upon information and belief, loss of consciousness for five minutes or longer from head trauma is considered to be an indication of a Grade III concussion, which is the most severe on a scale of I to III. *See, e.g.,* https://mayfieldclinic.com/pe-concussion.htm. Such a concussion should be reported, examined, and treated by a medical professional to avoid risks of long-term, adverse consequences. *Id*. Nevertheless, when describing the beating to the paramedics for treatment later that night, Deputies McDowell and McCampbell grossly lied about how long Ms. Porter had remained unconscious—McDowell claiming "five seconds" and McCampbell claiming "no more than 20 seconds"—further placing Ms. Porter's life and limb in danger to conceal the seriousness of their own unlawful actions.

42.     After assaulting Ms. Porter and locking her up unconscious in the Sheriff's vehicle, the Defendant Deputies proceeded to remove Mr. Powell from his vehicle, where the deputies had detained him to helplessly witness the brutal beating of his daughter while trying to calm his young granddaughters, fearing for all their lives. The deputies had no cause to take Mr. Powell into custody. He had committed no crime and had been fully compliant with the deputies' unreasonable orders in the face of an immensely horrific and trying situation. The Children had also been unlawfully seized and detained this entire time witnessing the horror. They would be left alone without any caretaker if Mr. Powell were also removed and detained.

43.     Nevertheless, the Defendant Deputies callously ordered Mr. Powell out of the car and terrorized and humiliated him by making him walk backwards over 30 feet at gunpoint with his hands on the back of his head. Deputy McDowell had her gun pointed at Mr. Powel and the car where the Children were now sitting all alone. Officer

**SECOND AMENDED COMPLAINT**

Hollingshead had his shotgun out and oriented in the same direction in a show of excessive force.

44.     Deputy McCampbell handcuffed Mr. Powell and placed him in Officer Williams' Police vehicle after confirming with Officer Williams that the vehicle contained "a cage." Mr. Powell is 61 years old, decades older than Deputy McCampbell. Nevertheless, throughout the encounter, Deputy McCampbell demeaned and disrespected Mr. Powell (who is an elder) by calling him "young man," which to Mr. Powell sounded like the racial slur "boy" historically used to demean Black men.

45.     Yet even after all this, Mr. Powell continued to explain in a remarkably calm and polite manner that he and his daughter were just switching seats so that he could drive the rest of the way home. His three granddaughters (ages 3, 4, and 6) were left alone in the car in the dark, scared without their caretakers and having witnessed their mother/aunt being arrested and beaten, and their grandfather also being taken from them.

46.     The Deputies and Officers confirmed with Mr. Powell that there were only *three little girls* left in the car, but in a show of continued excessive force, Deputies McCampbell and McDowell and Officers Hollingshead and Williams swarmed Ms. Porter's vehicle at gun point further terrorizing the children. As they approached, Deputy McDowell was pointing her pistol at the Children in the vehicle (at Deputy McCampbell's direction) while Officer Hollingshead was donning his shotgun.

47.     To make matters worse, for the hour that the little girls were detained and alone, Defendants, including Deputies McCampbell, McDowell, Hamilton, and Carter, and Officers Hollingshead and Williams, under the supervision of Sergeant Stockton, were repeatedly shining police flashlights in the Children's faces and continuously illegally searching the car without probable cause, desperately looking for any pretext to justify their illegal conduct. Of course, they found no evidence of a crime. Because there was no crime.

48.     After Ms. Porter regained consciousness, Deputy McCampbell proceeded to question her and rummage through her purse (illegally searching it) all while she was

handcuffed in the Sheriff's vehicle. Ms. Porter was in shock and in tears. She could not and did not resist the unlawful conduct of the deputy, but rather politely provided her name and identification, which she was willing and trying to do all along. Deputy McCampbell called in the identification to the dispatch who immediately confirmed that Ms. Porter was in fact the owner of the vehicle and it was properly registered as reflected on the rear license plate. The time it took for Deputy McCampbell to obtain Ms. Porter's identification and confirm that it was her vehicle was under two minutes. Neither Deputy McCampbell nor Deputy McDowell asked about the mismatched license plate, and they did not issue Ms. Porter any infraction citation or fix-it ticket.

49.     The confusion with the license plate was that Ms. Porter had moved from Maryland to California and had forgotten to remove the Maryland front license plate. The Defendant Deputies simply needed to follow California law (California Penal Code § 853.5(a)) and allow Ms. Porter to provide her identification and an explanation, which she was more than willing to and trying to do. Instead, they chose to arrest, detain, and beat her without cause and inflicted immense injury to the entire family.

50.     After the assault, when other deputies and officers arrived at the scene, Deputies McDowell and McCampbell made false statements and fabricated evidence in collusion with one another to justify their unlawful attack, and to arrest and jail Ms. Porter and submit false evidence against her to the District Attorney for charges to be filed. Specifically, Deputies McCampbell and McDowell made the following false statements: (i) that Ms. Porter "did this to herself" (untrue); (ii) that the deputies initiated a traffic stop (untrue); (iii) that Ms. Porter was non-compliant and refused to get back in the car (untrue); (iv) that the Defendant Deputies put their hands on Ms. Porter because she tried to flee and attacked Deputy McDowell first (untrue); and (v) that Ms. Porter punched Deputy McCampbell in the face (untrue). All of these statements are provably false by video and audio evidence recorded by the Sheriff's deputies' body and dashboard cameras.

51.     When the paramedics arrived at the scene, Ms. Porter requested that they

transport her to the hospital. Deputies McCampbell and McDowell denied the request, continuing to lie to the paramedics by minimizing the injuries they had inflicted on Ms. Porter. Deputy McCampbell said that Ms. Porter had been unconscious for a total of "no more than twenty (20) seconds." Deputy McDowell minimized the assault even more egregiously, saying that Ms. Porter had been unconscious for "five (5) seconds." Both of these descriptions are provably false as Ms. Porter was unconscious for over five (5) minutes, and the deputies knew they were lying. In fact, Deputy McCampbell had dragged Ms. Porter to the Sheriff's vehicle and tossed her inside while she was unconscious (as recorded on video and audio), but he lied that she was able to move her legs and walk to the car so that he could minimize her injuries. As a result of the Defendant Deputies' deliberate lies to avoid accountability, Ms. Porter's head injuries were never properly examined.

52.     Instead of allowing the paramedics to take Ms. Porter to the hospital, as Ms. Porter had specifically requested, Deputy McDowell transported Ms. Porter in a Sheriff's vehicle to a hospital of their choice. Deputy McDowell made it clear that she was taking Ms. Porter to the hospital only to be "medically cleared" en route to jail, continuing to minimize the attack and injuries.

53.     Ms. Porter was checked into the emergency room of the North Bay Medical Center. She felt scared and intimidated in the hospital to fully share what had happened to her, since Deputy McDowell had participated in the beating and lied about it, and still had control over her. Ms. Porter had no privacy as Sheriff's deputies made sure that they were present during the medical examination.

54.     In addition to lying about how long Ms. Porter was unconscious, Sheriff's deputies continued to lie to hospital staff about the incident, mocking Ms. Porter and making her appear like the assailant and criminal. Ms. Porter recalls that she was not properly examined at the hospital, and it appeared that the hospital staff were there simply to "clear" her to be taken to jail, not to legitimately examine her. Despite the severe beating Ms. Porter had suffered and the likelihood that she had a Grade III

concussion, her head was not properly examined for a concussion. There was no MRI done that would normally have been performed in such a situation so that she could receive the proper treatment to avoid long-term, adverse consequences.

55.     Ms. Porter was thus swiftly moved through the hospital and transported by the Sheriff's deputies to the Solano County jail. They continued to treat her like a criminal based on Deputies McCampbell and McDowell's false and fabricated statements.

56.     The SCSO booked Ms. Porter on charges of obstruction and resisting executive officers and set bail for $25,000. The SCSO had no probable cause to hold Ms. Porter and yet they continued to violate her civil rights on the basis of lies. She was used as an example for new Sheriff's trainees on how to book and jail an arrestee. They seized Ms. Porter's purse containing her identification and cash. Using threats, Sheriff's deputies forced Ms. Porter to divulge her social security number, provide a DNA swab, and took her fingerprints. They were not entitled to any of this information because there was no justification for her arrest in the first place.

57.     Sheriff's deputies kept Ms. Porter imprisoned in a jail cell overnight on fabricated charges until Ms. Porter's husband, who was out of town, posted a $25,000 bond, which cost the couple $2,500 just to post. At the time of release, Ms. Porter was not allowed to make a phone call to have someone pick her up. Moreover, the SCSO released her without giving her the cash they had seized from her, which left her isolated without a ride or cash to make a phone call using a pay phone. Ms. Porter's mobile phone had been left in her own vehicle when Deputies McCampbell and McDowell unexpectedly took her into custody. Ms. Porter thus found herself lost in a strange area without a phone or any cash. Fortunately, she was able to find a Starbucks and briefly borrow a mobile phone from a stranger to call her family for help. Strangers living outside the Starbucks showed Ms. Porter more humanity than the Solano Sheriff's deputies and Dixon Police officers did. One man (without a home) bought her a drink from Starbucks and another woman (also without a home) shared some bread with her.

-17-
**SECOND AMENDED COMPLAINT**

Ms. Porter conversed with these people until her family arrived to pick her up.

58.     Regarding the cash that the SCSO seized from Ms. Porter, the SCSO placed it in a strange account that required Ms. Porter and her husband to go through a convoluted process to retrieve their money. They were charged significant fees.

59.     Based on Deputy McCampbell and McDowell's false statements, the SCSO recommended to the Solano County District Attorney's Office that Ms. Porter be criminally prosecuted for preventing an executive officer from performing a duty by means of threat or violence in violation of California Penal Code Section 69. Ms. Porter was restricted from traveling and was required to check in with the bail bond company on a weekly basis, which was very stressful and humiliating for a professional in her position who had done nothing wrong and had *her* rights violated.

60.     On September 28, 2020, the District Attorney's Office declined prosecution, filing a Notice of Intent Not to Prosecute. Ms. Porter showed up to the courthouse in early October, on the date she was required to appear, and received this Notice at the courthouse.

61.     Sheriff's deputies also detained Mr. Powell and restricted his freedom for approximately an hour, a significant portion of which he was detained in the rear of a Sheriff's vehicle with a cage in handcuffs, all of which was unjustified and unreasonable, as neither Ms. Porter nor Mr. Powell had done anything wrong.

62.     Eventually, on the same night that he was detained, Mr. Powell was released and allowed to drive back home in Ms. Porter's vehicle with the Children. Both Mr. Powell and the Children had been seized, detained, and terrorized for approximately an hour in violation of their constitutional rights.

## B.     Plaintiffs' Injuries

63.     As a result of the assault and excessive force and unlawful search and seizure and prolonged detention by Defendants, Plaintiffs suffered physical and psychological trauma—trauma that would scar anyone for life—and they are still dealing with the effects of this trauma.

64.     Ms. Porter suffered physical injuries to the head, face, neck, and body—all where officers had admittedly punched and kicked her. Her bruising showed that she was visibly struck in the neck and head areas near the spine that could have paralyzed or killed her. She had signs of a severe Grade III concussion. She was unconscious for more than five minutes and experienced long-term headaches, trouble sleeping, confusion, mood swings, irritability, feelings of sadness, feelings of nervousness and anxiety, sensitivity to light and noise, and dizziness.

65.     Ms. Porter was bruised all over her body and experienced pain in her neck, face, head, wrists, shoulders, and stomach from the arm lock, handcuffs, punches, knees, kicks, and strikes. The acute pain was extreme and persisted for approximately four weeks. Mr. Powell also experienced pain and bruising from the handcuffs that persisted for weeks.

66.     In addition, the Sheriff's deputies violently pulled out Ms. Porter's braids from her head, which was extremely painful. Over the course of the days that followed the beating, Ms. Porter found her braids falling out because they had been pulled so hard and weakened in multiple places. She eventually had to cut off the hair that she had grown for a decade, because the pain of the hair being ripped out was too much for her to take. It reminded her too much of the assault she had endured.

67.     The psychological trauma has been severe and long-lasting. Both Ms. Porter and Mr. Powell constantly relive the horror on a daily basis, experiencing fear, insecurity, mistrust, anxiety, and difficulty relaxing. They have nightmares.

68.     Moreover, as a result of the experience, Ms. Porter has not been able to connect with her children, husband, family, and friends as she did in the past. She has experienced feelings of shame and isolation, as well as frequent feelings of sadness and mistrust that she did not have before the incident. She even feels panic and anxiety upon physical touch. She finds it difficult to receive healing and engage in self-care as she did prior to the incident. She finds that she has a diminished feeling of self-love and struggles to continue living with the sense of dignity she felt before she was brutally attacked. She

describes it like living in a box.

69.     Mr. Powell also feels constant guilt and powerlessness for not being able to protect his daughter and family. As a father, he was made to watch his daughter be handcuffed and beaten by law enforcement without any provocation. Like any father, he wanted to stop the deputies, but he could not because they had badges and guns, and they had ordered him to stay inside the car. He firmly believes that if had he gotten out of the car, the deputies would have shot them both, which happens to people of color—people like Mr. Powell and his family—far too often. Mr. Powell knows logically that it is not his fault, that there is nothing he could have done differently, yet he still feels a sense of shame and loss of dignity that he constantly grapples with.

70.     The young children in the car have also been psychologically scarred, which places additional stress and burden on Ms. Porter, Mr. Powell, and their family, who must now worry about having to help their children deal with and process the trauma. For example, the children are now afraid to travel, which is a basic activity that children should be able to freely enjoy with their parents. It is well known in the psychology field that for children who are at the formative age range of three to six (as Ms. Porter's daughters and niece were), the psychological trauma of watching their mother, aunt, or other caretaker be taken from them or physically assaulted leaves deep feelings of insecurity—it is developmentally scarring and is clinically considered child abuse.

71.     Plaintiffs reside in Sacramento County and still travel periodically to the Oakland area. Each trip causes fear and anxiety as a result of what they experienced at the hands of the Solano County Sheriff's deputies and Dixon Police officers. Plaintiffs understandably fear that they may fall victim to excessive force and constitutional violations again driving through Solano County. The Children display separation anxiety from their parents in a manner that they did not before the assault.

**C.     Pattern and Practice of Racial Profiling and Excessive Force**

72.     Upon information and belief, the use of racial profiling and excessive force has become a pattern and practice among Sheriff's deputies in Solano County. In fact,

1  excessive force practices in Solano County are so numerous and rampant that it led to the

2  creation of the Solano County Major Crimes Task Force by the District Attorney in

3  November 2020. The Task Force is responsible for conducting independent

4  investigations into the use of deadly force by law enforcement officers in the County.

5  However, the Task Force has not done an adequate job, and deputies and officers

6  continue to engage in excessive force, which, upon information and belief, the County of

7  Solano and the Solano County Sheriff's Office, as well as the City of Dixon and Dixon

8  Police Department, condone and overlook, permitting it to continue.

9       73.    Upon information and belief, Defendants' gross assault and terror inflicted

10  upon Plaintiffs' family is consistent with the excessive force pattern and practice that

11  exist within Solano County and the City of Dixon. Indeed, even though these deputies'

12  lies were caught on tape, Solano County (and the Sheriff's Office) and the City of Dixon

13  (and the Police Department) have done nothing to address the constitutional violations or

14  hold the deputies and officers accountable for their illegal actions, cover-up, and

15  fabrication of charges. These actions, in combination with the frequency of excessive

16  force incidents in Solano County, show that the Solano County (and the Sheriff's Office)

17  and the City of Dixon (and the Police Department) have a policy of covering up and

18  condoning excessive force and racial profiling rather than investigating and eradicating

19  it.

20       74.    Upon information and belief, Defendant Sergeant Roy Stockton is a member

21  of or otherwise affiliated with the extremist group "The Three Percenters" (*see*

22  discussion below), and he oversaw the constitutional violations and knowingly approved

23  Deputies McCampbell and McDowell's crime reports containing the false statements and

24  fabrication of evidence, which were then submitted to the District Attorney's Office to

25  have Ms. Porter prosecuted on false charges.

26       75.    Upon information and belief, deputies at the SCSO, including Sergeant Roy

27  Stockton, belong to, are affiliated with, and/or support the extremist group known as The

28  Three Percenters. *See* Scott Morris, *Solano deputies, Vacaville councilmember promote*

*anti-government militia*, OPEN VALLEJO, February 4, 2021. Upon information and belief,
members and affiliates of The Three Percenters show a consistent penchant for extreme
force and violence and racist ideologies. *See infra*.

76.     Upon information and belief, the SCSO and County refuse to appropriately
and transparently investigate their deputies' membership and affiliation with this
extremist group, instead covering up, condoning, and permitting deputies to engage in
unlawful enforcement tactics based on extremist and racist ideologies within their ranks.
*See* Kim Fu, *Solano sheriff's staff accused of supporting anti-government militia group*,
THE MERCURY NEWS, February 11, 2021; Scott Morris, *FBI rebuffs sheriff's claim it
cleared deputies of extremist ties*, OPEN VALLEJO, April 26, 2021; *Solano County Sheriff
Slammed Over Response to Claim Some Deputies Belong to Extremist Groups*, CBS,
April 16, 2021; John Glidden, *Community Group Slams Sheriff for Lack of
Transparency*, SFGATE, April 15, 2021; Scott Morris, *Amid calls for investigation,
sheriff stands by deputies who displayed militia support,* OPEN VALLEJO, March 9, 2021;
Scott Morris, *Solano deputies, Vacaville councilmember promote anti-government
militia*, OPEN VALLEJO, February 4, 2021.

77.     Upon information and belief, the Three Percenters is a far-right, pro-gun
militia group opposed to the U.S. government. It was founded in 2008 as a reaction to the
election of President Barak Obama. *See Jury convicted man in Oklahoma City federal
bomb plot trial*, ASSOCIATED PRESS, February 25, 2019. Upon information and belief, in
response to Black Lives Matter protests following the 2014 shooting of Michael Brown
in Ferguson, Missouri, the Three Percenters' Facebook page featured numerous racist
comments made by its supporters. *See* Mockaitis, Thomas R., *Violent Extremists:
Understanding the Domestic and International Terrorist Threat*, Santa Barbara,
California: PRAEGER, pp. 80–81, ISBN 978-1-4408-5949-6 (2019).

78.     Upon information and belief, many members of the Three Percenters group
are former and current members of the military, police, and other law-enforcement
agencies, as well as other anti-government groups such as the Oath Keepers. *See Spencer*

*Sunshine, Profile on the Right: Three Percenters*, POLITICAL RESEARCH ASSOCIATE,

January 5, 2016; Avlon, John, *Anti-government hate militias on the rise*, CNN, March 31,

2010.

79.     Upon information and belief, the group's members have a record of

involvement in criminal activity and have been associated with acts of violence as well as

violent threats. *See* Spencer Sunshine, *Profile on the Right: Three Percenters*, POLITICAL

RESEARCH ASSOCIATES, January 5, 2016.

80.     Upon information and belief, supporters of The Three Percenters, among

others, were reportedly present and wore emblematic gear or symbols during the riots

and storming of the U.S. Capitol on January 6, 2021. *See* Thomas Pallini, *Photos show

the aftermath of an unprecedented and destructive siege on the US Capitol that left 4

rioters dead*, BUSINESS INSIDER, January 7, 2021; *Trump supporters storm Capitol; DC

National Guard activated; woman fatally shot*, THE WASHINGTON POST, January 7, 2021.

After breaching or being let through multiple police perimeters, these groups occupied,

vandalized, and ransacked parts of the building for several hours. *Id*. At least one man

tied to the Three Percenter movement was arrested and charged with involvement in the

attack; the man was also reportedly tied to two other extremist groups, the Oath Keepers

and the Proud Boys, who are known for their racist ideologies and rhetoric. *See* Devlin

Barrett & Spencer S. Hsu, *FBI probes possible connections between extremist groups at

heart of Capitol violence*, WASHINGTON POST, January 17, 2021; Jaclyn Peiser, *Texas

man at Capitol riot allegedly threatened to kill his kids if they turned him in: 'Traitors

get shot'*, WASHINGTON POST, January 19, 2021.

81.     Upon information and belief, the Three Percenter group also operates in

Canada, and one Canadian expert, Maxime Fiset, a former neo-Nazi who works with the

Centre for the Prevention of Radicalization Leading to Violence, created in 2015 by the

City of Montréal with the support of the Quebec Government, considers the Three

Percenters group the "most dangerous extremist group" in Canada. *See* Hutter, Christy,

*Three Percenters are Canada's 'most dangerous' extremist group, say some experts*,

**SECOND AMENDED COMPLAINT**

CBC, May 10, 2018. Upon information and belief, in June 2021, six men associated with the Three Percenters group were indicted for conspiracy in Canada, and Canada declared the group a terrorist entity. *Canada puts U.S. Three Percenters militia on terror list, cites risk of violent extremism*, REUTERS, June 25, 2021.

82.     California Government Code Section 25307.7 authorizes Solano County to establish an oversight board to oversee the Sheriff's Office, but the County has actively resisted establishing such a board. In fact, the County has gone out of its way to strike down any measure that would establish the board—a board that would actively and independently investigate the pattern and practice of excessive force and racial discrimination that is currently being condoned and permitted by the Solano County Sheriff's Office and Dixon Police Department.

### D.     Concealment and Spoliation of Evidence

83.     After the Defendant Deputies had assaulted and imprisoned Ms. Porter, numerous other law enforcement officers (from the Solano County Sheriff's Office and the Dixon Police Department) arrived at the scene, including the Defendant Deputies' supervisor, Sergeant Roy Stockton.

84.     As Defendant Stockton was walking over to the scene of Defendants' crime, a firefighter could be heard on Stockton's body camera saying, "Going to look out for one of your boys . . . he messed up;" to which Stockton responded, "Yeah. Thanks."

85.     After that, Defendant Sergeant Stockton approached Deputies McCampbell, McDowell, Hamilton, and Carter. As Defendant Stockton began speaking to Deputy McDowell, she signaled to him and said that they should turn off their body cameras, quite obviously to avoid being recorded. Stockton agreed and they both quickly turned off their body cameras before discussing what had occurred. McDowell can actually be seen turning off her body camera. Nevertheless, the Sheriff's Office and County have refused to turn over McDowell's body camera footage during the assault despite the fact that Plaintiff has made numerous requests for preservation as well as production under Gov. Code Section 6250 *et seq*. dating back to January 12, 2021. The Sheriff's Office

and County claim that the footage does not exist, but video evidence shows this to be untrue.

86.    Similarly, the Sheriff's Office and County have also not produced footage of Deputy McCampbell's dash camera even though, on information and belief, Sheriff's vehicles' dash cameras are programmed to record constantly, and the footage should exist.

87.    Plaintiffs believe that by concealing these videos Defendants are engaged in spoliation activity to conceal or destroy evidence that would further demonstrate their assault and falsification of evidence against Ms. Porter.

88.    Defendants have been and continue to be on notice that they are under an obligation to preserve all evidence. Moreover, if they continue to claim that this footage does not exist, Plaintiffs intends to move the Court for a forensic examination of the subject cameras—McDowell's body camera and McCampbell's dash camera from August 6, 2020. The devices should be preserved.

### E.    Administrative Claim

89.    On January 13, 2021, Plaintiffs submitted an administrative claim to Solano County for the violations of the Solano County Sheriff's Office. The claim complied in all respects with Cal. Gov. Code § 910. However, on January 20, 2021, a representative from Solano County left a voicemail stating that the forms would not be accepted and needed to be resubmitted because they appeared to be scanned or photocopied instead of the signatures being in "original blue ink," which is not a statutory requirement. The County required Plaintiffs to resubmit the claim forms with "original blue ink" signatures before the claims could be considered and processed even though Cal. Gov. Code § 910 includes no such requirement. Plaintiffs contend that this "original blue ink" signature requirement is an arbitrary and capricious requirement above and beyond what Cal. Gov. Code § 910 requires—it is a nonsensical measure by Solano County intended to make it difficult for people to file claims for constitutional and other violations; it is further evidence of the County's assistance to the Sheriff's Office in condoning their deputies'

violations of the law.

90.     On January 20, 2021 (the same day the County official informed counsel that an original blue ink signature was required), Plaintiffs resubmitted their administrative claim forms with original blue ink signatures even though there was no legal requirement to do so, simply to avoid conflict.

91.     On February 24, 2021, an adjuster representing Solano County called to request additional information about the administrative claim in order to process the claim. Plaintiffs' counsel called back the adjuster and left a voicemail but did not hear from him again.

92.     To date, Defendants have not responded to Plaintiffs' administrative claim. Therefore, in this case, Cal. Gov. Code § 945.6 authorizes Plaintiffs to file this suit against Solano County and the Solano County Sheriff's Office within two years from the accrual of the cause of action. Cal. Gov. Code § 945.6(a)(2).

93.     Furthermore, when Plaintiffs filed their Complaint and First Amended Complaint ("FAC"), they were under the impression that the constitutional violations in this case had been committed solely by deputies of the Solano County Sheriff's Office. However, on January 4, 2022, through outside counsel for Solano County, Plaintiffs learned for the very first time that Dixon Police Department Officers Gabriel Hollingshead and Aaron Williams were also involved in the violations alleged by Plaintiffs. Prior to this, Plaintiffs did not know the identities of these officers and reasonably believed that they were Solano County Sheriff's deputies. (*See, e.g.,* Dkt. 12 (FAC), ¶¶ 18-21; 39-43). Plaintiff thus believed they had timely submitted their administrative claim to Solano County against these officers' actions, as reflected in the Complaint and FAC.

94.     Indeed, after the filing of the FAC, even outside counsel for Solano County needed time to determine whether or not these officers were Solano County Sheriff's deputies at the time of the incident before providing Plaintiffs the information on January 4, 2022 (for the very first time), which included the Dixon Police officers' identities and

place of employment on the relevant dates.

95.     The very next day, on January 5 and 6, 2022, Plaintiffs, acting with diligence, contacted the City of Dixon and the Dixon Police Department to inquire about the procedure for filing a claim for damages against the City of Dixon and the Dixon Police Department under Cal. Gov. Code § 910, *et seq*. However, no one at the City or the Police Department was able to provide any information.

96.     On January 6, 2022, within two days of learning the identities of the Dixon Police officers and the fact of their involvement, Plaintiffs mailed letters to both the City of Dixon and the Dixon Police Department, complying with all the statutory requirements of Gov. Code § 910 and attaching the FAC, which describes in detail the factual basis for the claim. Plaintiffs also included a check in the amount of $25 to the City of Dixon as the claim filing fee in compliance with Gov. Code § 911.2.

97.     The claim is thus permissible and timely under the delayed-discovery doctrine and allows Plaintiffs to move forward with this suit. *See Martinez v. Cty. of Sonoma*, No. 15-cv-01953-JST, 2015 U.S. Dist. LEXIS 122427, at *13 (N.D. Cal. Sep. 12, 2015) (the presentation requirement under California Government Claims Act may be tolled by the delayed discovery doctrine).

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**FOURTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

**42 U.S.C. § 1983**

**(UNLAWFUL SEIZURE)**

**(AIDING AND ABETTING)**

(*Against All Individual Defendants*)

98.     Plaintiffs Nakia Porter, Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all individual Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one

another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

99.     "The Fourth Amendment protects against unreasonable seizures by the government." *Gonzalez v. ICE*, 975 F.3d 788, 819 (9th Cir. 2020) (citing U.S. Const. amend. IV). "The infringement on personal liberty of any 'seizure' of a person can only be 'reasonable' under the Fourth Amendment if we require the police to possess 'probable cause' *before* they seize him." *Id.* (emphasis in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 38 (1968)). "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

100.    When a person is seized for a traffic infraction, so too are all other persons in the vehicle. *Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021). The California Penal Code clearly provides that, for traffic infractions, "a peace officer shall *only* require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear. . . . *Only if* the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody." Cal. Penal Code § 853.5(a).

101.    As described in detail above in Section IV(Facts Common to All Counts), Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments, by seizing, arresting, unreasonably taking into custody, and prolonging the detention of Plaintiffs without cause and in violation of clearly established state and federal law. Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

102.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

103.   Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

### SECOND CLAIM FOR RELIEF

#### FOURTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

#### VIOLATION OF 42 U.S.C. § 1983

#### (EXCESSIVE FORCE)

#### (AIDING AND ABETTING)

*(Against All Individual Defendants)*

104.   Plaintiffs Nakia Porter, Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all individual Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

105.   "Excessive use of force in effectuating a seizure violates the Fourth Amendment." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1165 (9th Cir. 2014) (citing *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989)). Drawing and pointing a gun at an unarmed, compliant suspect constitutes excessive force. *Id*. (citing *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (*en banc*)). Handcuffing and detaining a person not suspected of any crime also constitutes excessive force. *Id*.

106.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments, by unreasonably pointing a gun at, handcuffing, detaining, and assaulting Plaintiffs. Defendant Stockton failed to perform

his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

107.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

108.   Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

## THIRD CLAIM FOR RELIEF

### FOURTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

### VIOLATION OF 42 U.S.C. § 1983

### (UNLAWFUL SEARCH)

### (AIDING AND ABETTING)

*(Against All Individual Defendants)*

109.   Plaintiffs Nakia Porter, Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all individual Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

110.   "The Fourth Amendment protects the right of the people to be free from unreasonable searches and seizures." U.S. Const., amend. IV. "[A] violation [of the Fourth Amendment] occurs when government officers violate a person's 'reasonable expectation of privacy.'" *United States v. Jones*, 565 U.S. 400, 406 (2012).

111.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States,

1   including the Fourth and Fourteenth Amendments, by unreasonably searching their

2   vehicle and person without probable cause. Defendant Stockton failed to perform his

3   duty to appropriately supervise the deputies and officers, and rather aided and abetted

4   them in covering up the violations, knowingly approving their falsified reports for

5   submission to the District Attorney to recommend prosecution against Ms. Porter in order

6   to shield Defendants from liability.

7       112.   As a direct and proximate result of Defendants' aforementioned acts,

8   Plaintiffs were injured as set forth above.

9       113.   Individual defendants are personally liable under 42 U.S.C. § 1983 and not

10  immune based on the doctrine of qualified immunity.

11

12                          **FOURTH CLAIM FOR RELIEF**

13  **FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

14                      **VIOLATION OF 42 U.S.C. § 1983**

15              **(FALSE STATEMENTS AND FABRICATION OF EVIDENCE)**

16                          **(AIDING AND ABETTING)**

17          (*Against Defendants Stockton, McCampbell, and McDowell*)

18      114.   Plaintiff Nakia Porter ("Plaintiff" for purposes of this claim) brings this

19  claim for relief against Defendants Stockton, McCampbell, and McDowell ("Defendants"

20  for purposes of this claim), all of whom aided and abetted one another in the acts alleged

21  in this claim. Plaintiff realleges and incorporates by reference in this claim each and

22  every allegation of the preceding paragraphs with the same force and effect as though

23  fully set forth herein.

24      115.   "[T]here is a clearly established constitutional due process right not to be

25  subjected to criminal charges on the basis of false evidence that was deliberately

26  fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir.

27  2001).

28      116.   As described in detail above in Section IV (Facts Common to All Counts),

Defendants, acting under color of state law, intentionally deprived Plaintiff of rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth, Fifth, and Fourteenth Amendments, by imprisoning Plaintiff on fabricated charges and submitting false evidence against her to conceal their own unlawful acts. Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney to recommend prosecution against Ms. Porter in order to shield all Defendants from liability.

117.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiff was injured as set forth above.

118.   Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

### FIFTH CLAIM FOR RELIEF

#### FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION

#### VIOLATION OF 42 U.S.C. § 1983

#### (EQUAL PROTECTION)

#### (AIDING AND ABETTING)

*(Against All Individual Defendants)*

119.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all individual Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

120.   The Fourteenth Amendment prohibits law enforcement officers from acting in an intentionally discriminatory manner. *Lacy v. Villeneuve*, No. C03-2442JLR, 2005

1  U.S. Dist. LEXIS 31639, at *12 (W.D. Wash. Nov. 21, 2005) (citing *Bingham v. City of*

2  *Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003)).

3      121.   As described in detail above in Section IV (Facts Common to All Counts),

4  Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights,

5  privileges, and immunities secured by the Constitution and laws of the United States,

6  including the Fourth and Fourteenth Amendments, by unreasonably pointing a gun at,

7  handcuffing, detaining, and assaulting Plaintiffs, and additionally jailing and fabricating

8  evidence against Plaintiff Porter and submitting her case for prosecution. Plaintiffs had

9  done nothing wrong, and their only distinguishing characteristic was that they are

10  identifiably Black. Indeed, Deputy McCampbell had racially demeaned Mr. Powell by

11  referring to him as "young man," which to Mr. Powell sounded like the racial slur "boy"

12  used to demean Black men. The Defendant Deputies together pulled out Ms. Porter's

13  braids as they were beating her, which, for a Black woman, is not only very painful but

14  soul crushing because it takes years of care and grooming to grow and develop the locks.

15  Defendants even went as far as to intentionally terrorize the little children at the scene, all

16  under age six and all of whom are Black, approaching them with a pistol pointed at them

17  and a shotgun, and repeatedly shining flashlights in their faces after intentionally having

18  detained and isolated them from their caretakers without cause for approximately an

19  hour.

20      122.   As discussed in greater detail above, the Defendant Deputies are supervised

21  by Defendant Sergeant Roy Stockton who oversaw the unlawful actions alleged herein

22  and who is reported to have ties to the extremist group The Three Percenters, whose

23  members have openly espoused racists beliefs and made racist remarks. Sergeant

24  Stockton not only oversaw the constitutional violations but knowingly approved the false

25  reports written by Deputies McDowell and McCampbell to cover up their racially

26  motivated attack on Plaintiffs and to have Plaintiff Porter charged based on false

27  evidence.

28      123.   Upon information and belief, the SCSO and County refuse to appropriately

and transparently investigate their deputies' membership and affiliation with the extremist group The Three Percenters, instead concealing, condoning, and permitting deputies to engage in unlawful enforcement tactics based on extremist and violent racist ideologies within their ranks.

124.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were and continue to be injured as set forth above.

125.   Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

### SIXTH CLAIM FOR RELIEF

### CAL. CIV. CODE § 52.1 (TOM BANE CIVIL RIGHTS ACT)

### (AIDING AND ABETTING)

*(Against All Defendants)*

126.   119.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

127.   The Tom Bane Civil Rights Act provides for liability when a defendant's threats, intimidation, or coercion interferes or attempts to interfere with "the exercise or enjoyment by any individual of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a).

128.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, engaged in threats, intimidation, or coercive acts that interfered with or attempted to interfere with the rights of Plaintiffs secured under the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution, Sections 7

and 13 of Article I of the California Constitution, and Cal. Pen. Code § 853.5. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

129.   Defendants unlawfully took Plaintiffs into custody and imprisoned and detained them without probable cause for an unreasonably lengthy period, with the particular purpose of depriving Plaintiffs of the protections that applied to them under the U.S. and California Constitutions and state law.

130.   Defendants additionally unlawfully applied excessive force against Plaintiffs with the particular purpose of depriving Plaintiffs of the protections that applied to them under the U.S. and California Constitutions and state law.

131.   In addition, Defendants unlawfully searched Plaintiffs and their vehicle without probable cause and in a fishing expedition to find pretext for their own unlawful actions after-the-fact, with the particular purpose of depriving Plaintiffs of the protections that applied to them under the U.S. and California Constitutions and state law.

132.   Defendants also fabricated evidence against Ms. Porter in an attempt to have her falsely charged with the particular purpose of depriving her of the protections that applied to her under the U.S. and California Constitutions and state law

133.   Defendants' deliberate and reckless actions caused Plaintiffs to directly and proximately suffer significant harm and injury.

134.   Individual defendants are personally liable under the Bane Civil Rights Act.

135.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable under the Bane Act. Cal. Gov. Code § 815.2.

## SEVENTH CLAIM FOR RELIEF

### CAL. CIV. CODE § 51.7 (RALPH CIVIL RIGHTS ACT)

### (AIDING AND ABETTING)

(*Against All Defendants*)

136.    Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

137.    The Ralph Civil Rights Act provides that "[a]ll persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of [their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status] . . . because another person perceives them to have one or more of those characteristics." Cal. Civ. Code §§ 51 and 51.7.

138.    As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally committed violence and intimidation by threat of violence against Plaintiffs on account of their race, color, and ancestry by unlawfully pointing a gun at, handcuffing, detaining, searching, and assaulting Plaintiffs, and additionally jailing and fabricating evidence against Ms. Porter and submitting that evidence to have her falsely prosecuted. Plaintiffs had done nothing wrong, and their only distinguishing characteristic was that they are identifiably Black. Indeed, Deputy McCampbell had racially demeaned Mr. Powell by referring to him as "young man," which to Mr. Powell sounded like the racial slur "boy" used to demean Black men. Defendants McCampbell and McDowell together pulled out Ms. Porter's

braids as they were beating her, which, for a Black woman, is not only very painful but soul crushing because it takes years of care and grooming to grow and develop the locks. The remaining Defendant Sheriff's deputies and Dixon police officers participated in unlawful seizure and search and excessive force against all Plaintiffs.

139.   As discussed in detail above, the Defendant Deputies are supervised by Defendant Sergeant Roy Stockton, who is reported to have ties to the extremist group The Three Percenters, whose members have openly espoused racists beliefs and made racist remarks. Sergeant Stockton oversaw the constitutional violations of the Defendant Sheriff's deputies and Dixon police officers and knowingly approved the false reports written by Deputies McDowell and McCampbell to cover up their racially motivated attack on Plaintiffs and to have Ms. Porter falsely charged.

140.   The SCSO and County refuse to appropriately and transparently investigate their deputies' membership and affiliation with the extremist group The Three Percenters, and/or other such racist and extremist groups, and instead conceal, condone, and permit racist and violent extremist ideologies within their ranks.

141.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were and continue to be injured as set forth above.

142.   Individual defendants are personally liable under the Ralph Civil Rights Act.

143.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

### EIGHTH CLAIM FOR RELIEF

### CAL. GOV. CODE § 815.6

### (Aiding & Abetting)

(*Against All Defendants*)

144.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

145.   "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Cal. Gov. Code § 815.6.

146.   California Penal Code Section 853.5 imposes a duty upon peace officers to *not* take into custody any person seized for a traffic infraction, and the person may be taken into custody *only if* that person is unable to present identification or refuses to sign a notice to appear. Cal. Pen. Code § 853.5(a). The statute is clearly designed to protect the public from unreasonably being taken into custody by peace officers investigating a traffic infraction.

147.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, failed to discharge their duty in that, for the pretextual reason of a "mismatched" license plate (a nonmoving, noncriminal minor traffic infraction, at best), Defendants took Ms. Porter and Mr. Powell into custody without so much as asking for an identification or explanation even though they were more than willing to and trying to provide both. They never questioned Plaintiffs about the mismatched license plate or presented them with any citation or notice to appear.

Instead, the Defendants seized and detained Plaintiffs for an unreasonably lengthy period of time taking them both into custody without cause. The Children were also detained alone for an hour in Defendants' custody without their caretakers. Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

148.   Plaintiffs suffered injury as a direct and proximate result of Defendants' conduct.

149.   All Defendants are therefore directly liable under Cal. Gov. Code § 815.6.

150.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

### NINTH CLAIM FOR RELIEF

### FALSE IMPRISONMENT

### (AIDING AND ABETTING)

### (*Against All Defendants*)

151.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

152.   "False imprisonment involves the intentional confinement of another against the person's will. The elements are (1) nonconsensual, intentional confinement of a

person, (2) without lawful privilege, (3) for an appreciable period of time, however brief." *Bocanegra v. Jakubowski*, 241 Cal. App. 4th 848, 854 (2015) (citations omitted). *See also Young v. City of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011).

153.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally, recklessly, and negligently took and held Plaintiffs in custody and confined them against their will for an appreciable period of time, even though they had no privilege to do so, and constitutional and state statutory law explicitly prohibited Defendants from any of this. *See* U.S. Const., amend. IV and XIV; Cal. Const., art. 1, §§ 7 and 13; Cal. Pen. Code § 853.5. Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

154.   The false imprisonment directly and proximately injured Plaintiffs.

155.   Individual defendants are personally liable for false imprisonment.

156.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

## TENTH CLAIM FOR RELIEF

### ASSAULT & BATTERY

### (AIDING AND ABETTING)

*(Against All Defendants)*

157.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all Defendants ("Defendants" for purposes of this claim), all of whom aided and abetted one another in

the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

158.   "The essential elements of a cause of action for assault are: (1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm." *So v. Shin*, 212 Cal.App.4th 652, 668-69 (2013).

159.   "The essential elements of a cause of action for battery are: (1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching." *Id.* at 669.

160.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally, recklessly, and negligently, and with the intent to harm Plaintiffs, pointed one or more guns at Plaintiffs, placed Plaintiffs in handcuffs, took Plaintiffs into custody and confined them against their will; they beat Plaintiff Porter unconscious even though constitutional and state statutory law explicitly prohibited Defendants from doing any of this. *See* U.S. Const., amend. IV and XIV; Cal. Const., art. 1, §§ 7 and 13; Cal. Pen. Code § 853.5. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies and Officers, and rather aided and abetted them in committing and covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

161.   Plaintiffs did not consent to Defendants' offensive conduct and reasonably believed that they were going to be harmed and were harmed, as any reasonable person

in Plaintiffs' position would have been.

162.   Defendants' offensive conduct directly and proximately injured Plaintiffs.

163.   Individual defendants are personally liable for assault and battery.

164.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

### ELEVENTH CLAIM FOR RELIEF

#### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### (AIDING AND ABETTING)

#### (*Against All Defendants*)

165.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all Defendants ("Defendants" for purposes of this claim), who aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

166.   "A cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal.4th 1035,1050-1051 (2009) (internal quotation marks omitted).

167.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally, recklessly, and negligently, and with the intent to harm Plaintiffs, unlawfully pointed one or more guns at Plaintiffs,

placed Plaintiffs in handcuffs, took Plaintiffs into custody and confined them against their will, and searched Plaintiffs; they beat Plaintiff Porter unconscious and emotionally scarred the small children; they imprisoned her and attempted to bring fabricated charges against her on the basis of false statements in order to conceal their own unlawful acts, even though constitutional and state statutory law explicitly prohibited Defendants from doing any of this. *See* U.S. Const., amend. IV and XIV; Cal. Const., art. 1, §§ 7 and 13; Cal. Pen. Code § 853.5. Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in committing and covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

168.   Defendants' conduct was extreme and outrageous and was done with the intention of causing, or in reckless disregard of the probability of causing, emotional distress to Plaintiffs. Defendants' conduct was carried out in direct violation of constitutional and statutory law and in a willful abuse of power; it was intended to cause extreme injury to Plaintiffs and their children with the realization that it would do so. Defendants' conduct was so extreme as to exceed all bounds of that usually tolerated in a civilized community.

169.   Plaintiffs suffered severe or extreme emotional distress and injury as a direct and proximate result of Defendants' outrageous conduct.

170.   Individual defendants are personally liable for assault and battery.

171.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

**SECOND AMENDED COMPLAINT**

## TWELFTH CLAIM FOR RELIEF

### NEGLIGENCE PER SE

### (AIDING AND ABETTING)

*(Against All Defendants)*

172.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P. ("Plaintiffs" for purposes of this claim) bring this claim for relief against all Defendants ("Defendants" for purposes of this claim), who aided and abetted one another in the acts alleged in this claim. Plaintiffs reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

173.   To establish negligence *per se*, "plaintiff must show that (1) defendant violated a statute, ordinance or regulation of a public entity, (2) the violation proximately caused his injury, (3) the injury resulted from an occurrence of the nature which the statute was designed to prevent; [and] (4) he was one of the class of persons for whose protection the statute was adopted." *Sierra-Bay Fed. Land Bank Assn. v. Superior Court*, 227 Cal. App. 3d 318, 336 (1991).

174.   Plaintiffs belong to the class of persons that Cal. Pen. Code § 853.5 was designed to protect.

175.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants violated Cal. Pen. Code § 853.5 by unlawfully taking Plaintiffs into custody and prolonging their detention, and Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in committing and covering up the violations, knowingly approving their falsified reports for submission to the District Attorney to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

176.   These violations directly and proximately caused injury to Plaintiffs and the injury resulted from an occurrence the nature of which Cal. Pen. Code § 853.5 was designed to prevent.

**SECOND AMENDED COMPLAINT**

177.   Plaintiffs belong to the class of persons that the Bane Civil Rights Act was designed to protect.

178.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants violated the Bane Civil Rights Act, and Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in committing and covering up the violations, knowingly approving their falsified reports for submission to the District Attorney to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

179.   These violations directly and proximately caused injury to Plaintiffs and the injury resulted from an occurrence of the nature which the Bane Civil Rights Act was designed to prevent.

180.   Plaintiffs belong to the class of persons that the Ralph Civil Rights Act was designed to protect.

181.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants violated the Ralph Civil Rights Act, and Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in committing and covering up the violations, knowingly approving their falsified reports for submission to the District Attorney to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

182.   These violations directly and proximately caused injury to Plaintiffs and the injury resulted from an occurrence of the nature which the Ralph Civil Rights Act was designed to prevent.

183.   Plaintiffs belong to the class of persons that the Cal. Gov. Code § 815.6 was designed to protect.

184.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants violated Cal. Gov. Code § 815.6, and Defendant Stockton failed to perform his duty to appropriately supervise the deputies and officers, and rather aided and abetted them in committing and covering up the violations,

1  knowingly approving their falsified reports for submission to the District Attorney to

2  recommend prosecution against Ms. Porter in order to shield Defendants from liability.

3          185.   These violations directly and proximately caused injury to Plaintiffs and the

4  injury resulted from an occurrence of the nature which Cal. Gov. Code § 815.6 was

5  designed to prevent.

6          186.   Individual defendants are personally liable for negligence *per se*.

7          187.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas

8  A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert

9  Thompson) are separately vicariously liable under state law, because their employees,

10  acting within the course and scope of their duties, are liable for this state law violation.

11  Cal. Gov. Code § 815.2.

12

13                          **THIRTEENTH CLAIM FOR RELIEF**

14                                    **NEGLIGENCE**

15                          **(MALICE AND OPPRESSION)**

16                                *(Against All Defendants)*

17          188.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr., L.P., A.P., and O.P.

18  ("Plaintiffs" for purposes of this claim) bring this claim against all Defendants

19  ("Defendants" for purposes of this claim). Plaintiffs reallege and incorporate by reference

20  in this claim each and every allegation of the preceding paragraphs with the same force

21  and effect as though fully set forth herein.

22          189.   At all times material to this complaint, Defendants, acting under color of

23  law, had a duty to ensure that they and their fellow deputies and officers followed the

24  law. Moreover, Sergeant Stockton, also acting under color of law, had a duty to supervise

25  the deputies and officers to ensure that they followed the law.

26          190.   However, as described in detail above in Section IV (Facts Common to All

27  Counts), Defendants, acting under color of state law, unlawfully seized and searched

28  Plaintiffs and used excessive force against them. Defendants intentionally committed

violence and intimidation by threat of violence against Plaintiffs on account of their race, color, and ancestry, all by unlawfully pointing a gun at, handcuffing, detaining, searching, and assaulting Plaintiffs, and emotionally injuring their small children in front of them, as well as jailing Ms. Porter and fabricating evidence against her, and then submitting that evidence to the District Attorney to have her falsely prosecuted. Plaintiffs had done nothing wrong, and their only distinguishing characteristic was that they are identifiably Black. Indeed, Deputy McCampbell had racially demeaned Mr. Powell by referring to him as "young man," which to Mr. Powell sounded like the racial slur "boy" used to demean Black men. Defendants together pulled out Ms. Porter's braids as they were beating her, which, for a Black woman, is not only very painful but soul crushing because it takes years of care and grooming to grow and develop the locks. While it appears that Defendants acted intentionally, at a minimum, they acted negligently and, in doing so, engaged in malice and oppression and despicable conduct with a willful and conscious disregard of the rights or safety of Plaintiffs.

191.   As discussed in detail above, the Defendant Deputies are supervised by Defendant Sergeant Roy Stockton, who is reported to have ties to the extremist group The Three Percenters, whose members have openly espoused violent, extremist beliefs and made racist remarks. Sergeant Stockton knowingly or, at a minimum, negligently approved the false reports written by Deputies McDowell and McCampbell to cover up their attack on Plaintiffs and to have Ms. Porter falsely charged, all of which appears to be racially motivated and unconstitutional regardless of racial bias. Sergeant Stockton thus engaged in malice and oppression and despicable conduct with a willful and conscious disregard of the rights or safety of Plaintiffs.

192.   Despite this and despite having video evidence of misconduct, Solano County and its Sheriff's Office refuse to appropriately and transparently investigate their deputies' constitutional violations and membership and affiliation with the extremist group The Three Percenters, and/or other such racist and extremist groups, and instead conceal, condone, and permit racist and violent extremist ideologies within their ranks,

permitting a pattern of constitutional violations to persist. At a minimum, County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) have acted negligently in refusing to appropriately investigate and condoning the unlawful activities of the Defendant deputies and officers.

193.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were and continue to be injured as set forth above.

194.   The individual defendants are personally liable for their negligence.

195.   The County of Solano, the Solano County Sheriff's Office (Sheriff Thomas A. Ferrara), the City of Dixon, and the Dixon Police Department (Police Chief Robert Thompson) are directly liable for their negligence, and separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

## VI.   PRAYER FOR RELIEF

WHEREFORE, on the basis of the foregoing claims, Plaintiffs pray that the Court grant judgment against Defendants as follows:

1.   General and compensatory damages in an amount according to proof;

2.   Special damages according to proof;

3.   Injunctive relief;

4.   Costs, restitution, and multiple damages according to proof;

5.   Punitive and exemplary damages according to proof;

6.   Any and all applicable statutory and civil penalties;

7.   Pre- and post-judgment interest on any amounts awarded;

8.   An award of attorneys' fees and costs, including expert costs;

9.   Leave to amend this complaint to conform to the evidence produced in discovery and at trial; and

**SECOND AMENDED COMPLAINT**

10.     Such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all triable issues.

Dated:  January 7, 2022                         ALMADANI LAW

                                   By:     */s/ Yasin M. Almadani*
                                          Yasin M. Almadani, Esq.

                                          *Attorney for Plaintiffs*

# EXHIBIT C

1  Gregory M. Fox, State Bar No. 070876
BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
2  2749 Hyde Street
San Francisco, California 94109
3  Telephone: (415) 353-0999
Facsimile: (415) 353-0990
4  Email:    gfox@bfesf.com
5
6  Attorneys for Defendant
SERGEANT ROY STOCKTON
7
8                    UNITED STATES DISTRICT COURT
9                    EASTERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| NAKIA V. PORTER, et al,<br><br>          Plaintiff,<br><br>v.<br><br>COUNTY OF SOLANO; et al.,<br><br>          Defendants. | Case No. 2:21-CV-01473-KJM-JDP<br><br>**DEFENDANT ROY STOCKTON'S SUPPLEMENTAL RESPONSE TO PLANTIFF NAKIA V. PORTER'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE (1), Number 4.** |

23  PROPOUNDING PARTY:   Plaintiff NAKIA V. PORTER

24  RESPONDING PARTY:   Defendant SERGEANT ROY STOCKTON

25  SET NUMBER:        ONE (1)

26
27
28
                                    1

**PRELIMINARY STATEMENT**

Defendant SERGEANT ROY STOCKTON ("DEFENDANT") has not yet completed his investigation or analysis of the facts relating to this case, has not completed discovery and has not completed preparation for trial.  Accordingly, these responses are given without prejudice to DEFENDANT's rights to produce evidence of any subsequently discovered facts or interpretations thereof and/or to add to, modify or to otherwise change or amend the responses herein.  The information hereinafter set forth is true and correct to the best of the DEFENDANT's knowledge at this time, and is subject to correction for inadvertent errors or omissions, if any errors or omissions shall hereafter be found to exist.

DEFENDANT expressly reserves the right to revise and/or supplement these responses, as additional information shall be forthcoming throughout the discovery process.

All documents to be produced are identified by their bate stamp number and will be produced by dropbox:

https://www.dropbox.com/scl/fo/51k7p1d1wgy4qgso6hh79/h?rlkey=8z53td3u6cn5cswds8bpfrs55&dl=0

**OBJECTIONS APPLICABLE TO ALL RESPONSES**

DEFENDANT objects to each and every Request on the grounds that it seeks information protected by the attorney-client privilege and the attorney work-product doctrines.  DEFENDANT hereby incorporates this objection into each and every one of its responses.  Under no circumstances are DEFENDANT's responses to act as a waiver of the attorney-client privilege and/or the attorney work-product doctrines.

**RESPONSES**

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:

For the period of ten years preceding the INCIDENT on August 6, 2020, through the present date, all DOCUMENTS, including e-mails and social media messages and postings, relating to all social, political, militant, pro-gun rights, patriotic, American nationalist, fascist, racist, white supremacist, or white nationalist organizations, clubs, associations, or groups that YOU belong/belonged to, are/were affiliated with, or attended meetings of. Examples of such organizations, clubs, associations, or groups in

DEFENDANT ROY STOCKTON'S SUPPLEMENTAL RESPONSE TO PLANTIFF NAKIA V. PORTER'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE (1), Number 4.
Porter v. County of Solano, et al.  Case No.: 2:21-CV-01473-KJM-JDP

this interrogatory (sic)  includes, but is not limited to, Proud Boys, Oath Keepers, Three Percenters, Constitutional Sheriffs, Boogaloo Movement, National Rifle Association, and the Ku Klux Klan.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Defendant incorporates by reference as though fully set forth below his initial response and objections to this Request No. 4 dated October 2023.  Reserving said objections Defendant Roy Stockton responds as follows that in Response to Request No. 4, Responding Party produces herein by drop box all responsive documents in his  possession, custody, and control:

1.    Facebook. (SC1509-1524)

2.    High Brass Leather Etsy. (SC1525-1527)

3.    High Brass Leather Instagram. (SC1528-1844)

4.    High Brass Leather Website. (SC1845-1851)

5.    Live Free EDC Instagram. (SC1852-1853)

6.    Live Free EDC Website. (SC1854-1863)


Dated:  February 23, 2024                    BERTRAND, FOX, ELLIOT, OSMAN & WENZEL



                                     By:  ____/s/ Gregory M. Fox_____
                                            Gregory M. Fox

                                     Attorneys for Defendant
                                     SERGEANT ROY STOCKTON

DEFENDANT ROY STOCKTON'S SUPPLEMENTAL RESPONSE TO PLANTIFF NAKIA V. PORTER'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE (1), Number 4.
Porter v. County of Solano, et al.  Case No.: 2:21-CV-01473-KJM-JDP

## CERTIFICATE OF SERVICE

I, the undersigned, declare that I am employed in the County of San Francisco, California; I am over the age of eighteen years and not a party to the within cause; and my business address is 2749 Hyde Street, San Francisco, California 94109.

I am readily familiar with the practice of Bertrand, Fox, Elliot, Osman & Wenzel with respect to the collection and processing of pleadings, discovery documents, motions and all other documents which must be served upon opposing parties or other counsel in litigation. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

On **February 23, 2024**, I served the following document:

**DEFENDANT ROY STOCKTON'S SUPPLEMENTAL RESPONSE TO PLANTIFF NAKIA V. PORTER'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE (1), Number 4.**

on the following interested parties:

Danielle K. Lewis, Esq.
dlewis@hpylaw.com
Miles F. Maurino, Esq.
mmaurino@hpylaw.com
HAWKINS PARNELL & YOUNG
33 New Montgomery, Suite 800
San Francisco, CA 94105
Telephone: (415) 766-3200
Facsimile: (415) 766-3250
*Attorneys for Defendants County of Solano, Sheriff Thomas A. Ferrara, Dalton McCampbell, Lisa McDowell, Connor Hamilton, and Chris Carter*

Yasin M. Almadani (SBN 242798)
yma@lawalm.com
Ahmed Iqbal Ibrahim
aibrahim@ailawfirm.com
ALMADANI LAW
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757

*Attorney for Plaintiffs*

Said service was performed in the following manner:

(✓)   **BY ELECTRONIC MAIL SERVICE (E-Mail):** Pursuant to CCP section 1010.6(e)(1), requiring represented parties to accept service by e-mail or electronic transmission, I caused the

documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed **February 23, 2024**, at San Francisco, California.

_____
Ellen L. Laverdure

CERTIFICATE OF SERVICE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFICATION

I, Roy Stockton, hereby declare:

I am a defendant in the above action, and am authorized to make this verification on my behalf. I have read and know the contents of the foregoing **DEFENDANT ROY STOCKTON'S SUPPLEMENTAL RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE (1)**, Item 4 propounded to defendant ROY STOCKTON. These responses were prepared with the assistance of counsel and these responses, subject to inadvertent and undiscovered errors, are based upon and necessarily limited by the records and information still in existence, presently recollected, and thus far discovered in the course of the preparation of these responses. The responses are true to the best of my knowledge, information, and belief.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed this February 23, 2024, at  Fairfield , California.

Roy Stockton

VERIFICATION

Porter v. County of Solano, et al.  Case No.: 2:21-CV-01473-KJM-JDP

# EXHIBIT D



cullypratt #comeandtakeit #2a #willnotcomply 2ndamendment #pro2 #dtom #livefreeordie #joinordie #gadsdenflag #wethepeople #molonlabe #gunstagram #ar15 #pewpew #freedom #guns #gaddy #tactical #rifle #nra #magpul #blackrifle #556 #3percenter #shallnotbeinfringed #libertyordeath #blackgunsmatter

222w

madscootercop That's awesome, you make that?

222w  1 like  Reply

ohthatsnicko So sick 👏

187 likes

OCTOBER 19, 2016

Add a comment...

WILL NOT COMPLY

Solano County Sheriff's Sgt. Cully Pratt poses with a rifle display rack he made for fellow sheriff's Sgt. Roy Stockton. The handmade wood display features symbolism associated with the far-right Three Percenter movement, which has been linked to several terrorist plots around the country.





heriff's Sgt. Cully Pratt poses

lay rack he made for fellow

y Stockton. The handmade

tures symbolism associated

# EXHIBIT E

## highbrassleather



**630** posts    **3,457** followers    **1,092** following

Leather items for your pocket

**Follow**



# This account is private

Follow this account to see their photos and videos.

# EXHIBIT F



**live_free_edc** • Follow



**live_free_edc** **#Repost @liberty_edc**

Getting ready for the election tomorrow 😬👍. Still mind-boggling that Hillary is not in jail. Just remember when you go vote "13 hours"🇺🇸 **#556 #45auto #9mm #glock23 #glock43 #glock36 #glock19 #DTOM #donttreadonme #palmettostatearmory #ar15 #ar9 @thepatriotmilitia @psamtp @therealpalmettostatearmory**

66 likes

NOVEMBER 7, 2016

Add a comment...                    Post

   liberty_edc



This is Sgt. Roy Stockton. He was elected to the Vacaville City Council last year.

Pratt made the board for him. Stockton also sells crafts with Three Percenter symbols.

In 2016, he reposted an image of guns that said, "Getting ready for the election tomorrow." 3/x

10:03 AM · Feb 5, 2021

**306** Reposts  **21** Quotes  **850** Likes

**5** Bookmarks

# EXHIBIT G



# Solano deputies, Vacaville councilmember promote anti-government militia

By **Scott Morris** | February 4, 2021



Members of the III% militia wait for instructions while training in Jackson, Ga. on Oct. 29, 2016. Credit: Kevin D. Liles / The New York Times, via Redux

D aniel "Cully" Pratt of the Solano County Sheriff's Office has a side business making decorative wood carvings. Some feature characters from movies starring his brother **Chris Pratt**, like "Jurassic World" and "Guardians of the Galaxy."

Others are more political, like the rifle display he made for Sgt. Roy Stockton, a Sheriff's Office colleague and recently-elected member of the Vacaville City Council.

2/9/24, 8:51 AM
Case 5:24-mc-80081-SVK   Document 1-4   Filed 04/03/24   Page 82 of 104
Solano deputies, Vacaville council member promote anti-government militia

The piece resembles a California flag, but instead of a bear, it features hooks for Stockton's AR-15 rifle above the words, "WILL NOT COMPLY." Thirteen shotgun shells, arranged like the stars of the Betsy Ross flag, form a circle around the Roman numeral III. Cully Pratt grins from behind his creation in a 2018 Instagram post, which he labeled with the hashtag, "#3percenter."



Solano County Sheriff's Sgt. Cully Pratt poses with a rifle display rack he made for fellow sheriff's Sgt. Roy Stockton. The handmade wood display features symbolism associated with the far-right Three Percenter movement, which has been linked to several terrorist plots around the country. Credit: Screenshot / Open Vallejo

Three Percenters are a loose-knit collection of far-right extremists **characterized** by anti-government, pro-gun views, and a willingness to violently defy the federal government. At least one person with Three Percenter ties **has been charged** in connection with the Jan. 6 **storming of the Capitol** in Washington, D.C., where five people died, including a police officer. Others have been connected to bombings and kidnapping plots.

The group appears to have ideological support within the Solano County Sheriff's Office. Pratt, Stockton and at least one other current sheriff's deputy have posted Three Percenter imagery on their public social media pages for years, an Open Vallejo investigation has found. Their friends and followers include staff at the sheriff's office. While not all interacted with the deputies' Three Percenter posts, their identity and stated views were clear.  Rather than face repercussions for their support of a group linked to violence, the deputies have risen in the ranks of the sheriff's office and have been trusted with high-profile public assignments.

Since the attack on the Capitol, long-simmering concerns about right wing violence have grown more pronounced, both locally and nationwide. The Department of Homeland Security **warned** last Wednesday of a heightened threat from anti-government extremists following President Joe Biden's inauguration. Last week, federal prosecutors charged American Canyon resident Ian Rogers with possessing five pipe bombs following his arrest in nearby Napa on Jan. 15. Investigators seized 49 guns and noted that Rogers had a Three Percenter emblem on his vehicle, **court records** show.

Case 5:24-mc-80081-SVK   Document 1-4   Filed 04/03/24   Page 84 of 104



David Butow / Redux

Supporters of President Trump clash with police at the United States Capitol on Jan. 6, 2021. A Three Percenter flag is visible in the foreground of the frame. Credit: David Butow / Redux

Open Vallejo contacted each of the deputies who posted extremist content, most of whom did not respond. Solano County spokesperson Matthew Davis declined to comment on whether county officials are active members of any anti-government militia.

‘We are everywhere’



Alex Flynn / Redux

Unidentified members of III% affiliated groups take part in a close-quarters battle drill during a multi-state training exercise near Denver, Colo., on July 25, 2015. Credit: Alex Flynn / Redux

Three Percenters do not have a central organization but instead are largely autonomous **groups** with sympathetic ideology. Formed in 2008 following the election of President Barack Obama, the group derives its name from the **erroneous** belief that only 3 percent of American colonists fought in the revolution against Great Britain. But instead of fighting an overseas oppressor, Three Percenters view the United States government as a tyrannical threat, especially in the context of gun control.

Nationwide, Three Percenters have been accused by federal authorities of plotting violence in a number of recent incidents. Adam Fox, one of the men accused of **plotting** to kidnap the governor of Michigan last year, was the leader of a Three Percenter group, according to investigators. A man in Ohio inspired by the Three Percenter movement was **arrested last May**

after he allegedly tried to recruit others to help kidnap or kill police officers. A former sheriff's deputy who led an Illinois Three Percenter group was **convicted in December of** bombing a mosque. A man who told undercover FBI agents he had "III% ideology" was **sentenced to 25 years** in prison for the attempted bombing of a bank in Oklahoma City in 2017.

Presenting themselves as modern-day patriots, Three Percenters make frequent reference to symbols of the American Revolution. The militia's logo consists of 13 stars, as in the Betsy Ross flag, arranged around the Roman numeral III.  The group's other visual references include the year 1776 and the **Gadsden flag**, which features a coiled rattlesnake above the words, "**Don't Tread on Me**."



Federal Bureau of Investigation

A Three Percenter decal was found on American Canyon resident Ian Rogers' vehicle when he was arrested in Napa earlier this month. Investigators seized five pipe bombs and dozens of guns, court records show.

**In plain sight**



Solano Family First Responders

Solano County Sheriff's Sgt. Roy Stockton, right, at a fundraiser for Solano Family First Responders, the charity he runs with Pratt. Stockton was sworn in as a member of the Vacaville City Council earlier this month. Solano County Public Works employee Galen "Jamie" Estes, who has a large Three Percenter tattoo, is seen second from left.

For years, Solano County Sheriff's officials have done little to hide their affinity for Three Percenter iconography.

Like Pratt, Stockton also sells items referencing far-right imagery. He sold leather under the name **High Brass Leather** and metal under the name **Live Free EDC**. Products with the coiled snake of the Gadsden flag and the Three Percenters logo could be observed throughout his stores and their corresponding social media accounts, which have since been set to private.

Among the items in Stockton's stores were a $200 knife clip and a **silver Gadsden flag bottle opener** listed at $746.40.

Stockton also reposted numerous photos with Three Percenter iconography. Just prior to the 2016 election, he shared a photo of several guns with the caption, "getting ready for the election tomorrow."

Stockton disavowed political violence when reached for comment.

"I strongly condemn the violent and racist views of these extreme right, militia, and anti-government groups," Stockton said in an email. "I believe that law enforcement officers and other public officials cannot keep their oaths to uphold the Constitution if they are associated with any extremist or anti-government groups."



In 2016, Stockton reposted this image from his company's Instagram account. The caption reads, in part, "Getting ready for the election tomorrow." Now a Vacaville city councilmember, Stockton says he "condemns" violence. Credit: Screenshot / Open Vallejo

Stockton did not respond to questions about why he displayed and sold Three Percenter paraphernalia, nor why Cully Pratt made him a Three Percenter display to hang his rifle. Stockton tagged the sheriff's official Instagram page from his leatherworking page. Both of his pages included the sheriff's office emblem.

Deputy Dale Matsuoka, the sheriff's office homeless outreach coordinator, has also posted
Three Percenter symbols on his public **Facebook page** under the name "Matt Daley"and other
aliases. On July 16, Matsuoka changed his Facebook profile picture to the Three Percenter
logo. It was accompanied by the slogan, "When tyranny becomes law, rebellion becomes duty."

Other current and former law enforcement officers showed frequent support for Matsuoka's
posts. One person who frequently "loved" Matsuoka's Three Percenter posts is **Jeremie
Patzer**, a former Vallejo police officer who shot a man outside a bar while off duty in 2005 and
killed a 21-year-old man with a Taser the following year. Despite Matsuoka's open support for
extremist views, like Pratt and Stockton, the Solano County Sheriff's Office has **highlighted**
him publicly for his work.



Screenshot / Open Vallejo

Recent images from Deputy Dale Matsuoka's Facebook page. Credit: Screenshot / Open Vallejo

Others who express affinity with the Three Percenter movement have close ties with sheriff's deputies. Pratt and Stockton run a nonprofit, Solano Family First Responders, for which they threw a fundraiser in October of 2019. Numerous law enforcement officials and local politicians attended, including **Sheriff Tom Ferrara** and Solano County Supervisors **Erin Hannigan** and **Mitch Mashburn**. A sheriff's lieutenant and Vacaville City Councilmember at the time, Mashburn endorsed Stockton to take his seat on the city council.

During the barbeque, Stockton took a selfie with three men. They include Galen "Jamie" Estes, an employee with the county public works department, who wore a black hooded sweatshirt with a white Spartan helmet situated between two rifles over the Greek phrase, "molṑn labé." The phrase, which means, "come and take them," is a rallying cry of anti-gun control hardliners.



County public works employee Galen "Jamie" Estes has the Three Percenter logo tattooed on his arm. Estes is connected with several Solano County sheriff's deputies, including members of the command staff. Credit: Screenshot / Open Vallejo

Estes also has a Three Percenter tattoo on his left arm, which appeared fresh when he showed it off in a 2017 Instagram post. He is friends with Stockton, Pratt and at least six other current members of the sheriff's office on Facebook, where he shared numerous Three Percenter symbols.

Estes' other Facebook friends include Sheriff's Lt. Jonathan Mazer and his ex-wife Sgt. Toni Mazer, who recently changed her name to Taylor after she remarried. Taylor "loved" a Three Percenter logo posted to Estes' Facebook page on Jan. 15. She did not respond to emailed questions about whether and to what extent she supports violent extremism.

As public information officer for the sheriff's office, Pratt was tasked with promoting the agency on Facebook and other social media. His famous brother often helped him get a boost of publicity, such as when he attended Super Bowl LII wearing a Solano County Sheriff's Office hat, which the agency **noted** on Facebook.



Stockton posted about Chris Pratt's appearance at a 2018 sheriff's fundraiser. Pratt has helped draw attention to his brother Cully Pratt's wood carving business, has featured far-right iconography. Credit: Screenshot / Open Vallejo

Chris Pratt has also promoted Cully Pratt's wood carving business to his own 30 million Instagram followers. He sees his brother frequently and has been photographed with Stockton as well. And Chris Pratt's fondness for patriotic imagery has at times shown a reverence for the Revolutionary War. In 2017, Cully Pratt took a selfie with his brother flashing one of Stockton's coiled snakes. Chris Pratt appeared at a sheriff's fundraiser screening of "Jurassic World" in 2018 wearing a hat with the 13 stars of the Betsy Ross flag. Last year, he drew scrutiny when he was **photographed** wearing a "Don't Tread on Me" shirt.

**'Strategic infiltration'**



Screenshot / Open Vallejo

In this still image from a video posted to Reddit last June, an Orange County sheriff's deputy is seen wearing a Three Percenter logo and other far-right imagery — but not his nametag — at a protest in Costa Mesa, Calif. He kept his job, according to news reports. Credit: Screenshot / Open Vallejo

Carolyn Gallaher, an American University professor who has studied far right movements, said she was not surprised that law enforcement officers support the Three Percenter movement.

"Far right movements have tried to infiltrate the military and policing and police have not done a very good job of making sure these people don't wear the badge," she said.

Indeed, at least **31 police officers in 12 states** are being investigated for their role in the riot at the Capitol, according to the Associated Press. The FBI has **investigated** far-right extremists' strategic infiltration of local law enforcement for **over a decade**. Officers responding to police brutality protests over the summer **displayed insignia** of the Three Percenters and Oath Keepers, another extremist group. A 2019 **investigation** by Reveal found hundreds of law enforcement officials in extremist Facebook groups.

The true depth of law enforcement **support** for extremism is difficult to ascertain. Many of the law enforcement officials' social media accounts reviewed by Open Vallejo used pseudonyms. One former California parole officer acknowledged using Parler, a social media company favored by far-right extremists that was shut down by its web hosting service because of its role in organizing the attack on the Capitol. The Oakland Police Department recently **launched an internal investigation** into an Instagram account spreading racist and sexist posts, but has been unable to identify the officer or officers who ran it.

There is also evidence Bay Area law enforcement support for violent extremism goes beyond Solano County. A former Oakland police officer who **attended** the Jan. 6 riot at the U.S. Capitol had his social media posts "liked" by several current and former officers. A Pleasanton police officer is reportedly **under investigation** for his social media posts during the riot. In 2017, the Oath Keepers **had a booth** at Urban Shield, a police training convention hosted by the Alameda County Sheriff's Office.



Screenshot / Open Vallejo

The official CHP Oakland account "liked" this Three Percenter patch on Instagram. A spokesperson insisted it was a mistake. Credit: Screenshot / Open Vallejo

The official Instagram account of the Oakland-area California Highway Patrol "liked" a post with a Three Percenter logo last year. CHP officials said that they have been unable to determine which employee "liked" the post or when but do not believe it is part of a pattern or suspect any officers of misconduct. Agency spokesperson Officer Sean Layton said that while officers should never take any political stance while acting as police, when they were off-duty they had the right to their own political opinion. He said the "like" was a mistake and took it down.

Gallaher called the idea that officers could affiliate with extremist groups like the Three Percenters in their spare time "nonsense."

"If you are a policing agency … you do not want extremists working for you, you shouldn't want that," she said. "It suggests that the police are supporting these groups and an agenda that is not to protect and serve all."

## SCOTT MORRIS

Scott Morris is an independent journalist in Oakland and San Francisco covering police use of force, civil rights, protest and neighborhood news. In 2020 he was a reporter with ProPublica's Local Reporting Network based at the Bay City News Foundation.

MORE BY SCOTT MORRIS

© 2024 Copyright 2023 Informed California Foundation.
Proudly powered by Newspack by Automattic

mobile



# Amid calls for investigation, sheriff stands by deputies who displayed militia support

By **Scott Morris** | March 9, 2021



Sheriff Tom Ferrara.

**S**olano County Sheriff Tom Ferrara indicated he does not plan to investigate potential far-right extremism within his agency, despite growing calls to do so after several deputies spent years promoting the Three Percenters, an anti-government militia whose adherents have planned and executed terrorist attacks across the country.

In a statement, Ferrara dismissed an Open Vallejo **investigation** published last month that revealed two sergeants and a deputy had displayed support for the Three Percenters. But

federal, state and local officials, including two members of Congress and a state assemblymember for Solano County, voiced alarm at the deputies' conduct and called on authorities to investigate.

"The events that transpired in Washington, DC on January 6th showcased to the world what will happen if hate and intolerance go unchecked and unaddressed in our society," U.S. Rep. John Garamendi, whose district includes Fairfield and Vacaville, said. "If the allegations in this report are true then steps must be taken to ensure these structural issues are addressed," he said.

Ferrara declined to respond to detailed written questions that Open Vallejo sent more than a week prior to publication. He said in the statement, released four days after Open Vallejo's article, that he did not believe the deputies aligned themselves with the extremist group they promoted.

"I want to be clear — the employees targeted in this article all serve this agency and this community with passion and dedication," Ferrara said. "The employees told me that their intention was to support the 2nd amendment and the U.S. Constitution."



Cully Pratt

Daniel "Cully" Pratt made this rifle rack for fellow Solano County Sheriff's Sgt. Roy Stockton, who was elected to the Vacaville City Council in November. It depicts the logo of the Three Percenters, a far-right militia that has been linked to terrorist plots across the country. An Open Vallejo investigation found that Pratt, Stockton, and Deputy Dale Matsuoka shared imagery linked to the extremist group over the course of several years. Credit: Cully Pratt

But according to the FBI and U.S. Department of Justice, the Three Percenter movement goes beyond support for the Second Amendment. Three Percenter ideology includes a willingness to violently resist the federal government, authorities have **alleged** in court papers. Adherents have been prosecuted for a series of bombing and kidnapping plots across the country. Numerous rioters at the U.S. Capitol on Jan. 6 displayed Three Percenter emblems and at least five people associated with the movement have been **charged** in connection with the day's events.

Rep. Mike Thompson, D-Napa and Chairman of the House Gun Violence Prevention Task Force, also called for further investigation.

"Any potential ties that law enforcement members or any public officials have to extremist groups should be promptly investigated by the authorities with the proper jurisdiction," Thompson said, noting that he called for a commission to investigate the attack on the Capitol and the government's failure to address domestic terrorism.

Assemblymember Tim Grayson, D-Concord, said he is "deeply concerned" about any extremist ties in the community and particularly law enforcement where their presence could further undermine trust.

"Accountability is a must," Grayson said, "and I support all efforts to hold public servants to the highest standards so that we can rebuild trust, ensuring everyone in our community can feel and be safe."

Robert McConnell, the newly-elected mayor of Vallejo, said that from what he knows about Three Percenters he believes it is incompatible with being a law enforcement officer and worried that such groups may have broader support in Solano County law enforcement. "That is a classic conflict of interest and requires a stand down from the position occupied to which tax payer dollars flow for true professional performance," McConnell said. "Anything less is not only unacceptable, unprofessional conduct, but lacks honor."

Solano County Supervisor Monica Brown noted that she could not comment on specific county employees, but said she found the extremist groups as described in the Open Vallejo article "deeply disturbing."

"After the insurrection on Jan 6th, it is even more incumbent on us to reject extremist groups and ideology that undermine our democratic government," she said.

Vallejo city councilmember Tina Arriola said that Three Percenter logos and other extremist imagery have no place in area law enforcement and any potential corruption should be investigated by an impartial and trustworthy third party. "These revelations have, I'm sure, created just cause for public concern that needs to be addressed and rectified," she said.

Local residents and community groups have also called for an investigation. In a **letter** published in the Vallejo Times-Herald, Benicia Black Lives Matter called the Open Vallejo

report "terrifying" and the sheriff's response "underwhelming."

"We demand the leaders of Solano County and City of Benicia not only visibly and vocally condemn right-wing extremism," the letter stated, "but also pledge to conduct a full investigation both at the county and city levels to ensure that policies and procedures — including those focused on recruitment and disciplinary actions — are in place to actively expel these extremists from the ranks of law enforcement and to prevent their recruitment in the first place."

The deputies who displayed Three Percenter emblems include Sgt. Daniel "Cully" Pratt, previously the department's public information officer; Sgt. Roy Stockton, whom Ferrara endorsed for the Vacaville City Council; and Deputy Dale Matsuoka, the department's homeless outreach coordinator.



Open Vallejo / Screenshot

Deputy Dale Matsuoka posted numerous Three Percenter symbols to his personal Facebook page under the name Matt Daley and other pseudonyms. Credit: Open Vallejo / Screenshot

Pratt and Stockton sold crafts with Three Percenter symbols and their posts suggested a willingness to violently defy the federal government, including a gun rack that Pratt made for Stockton's AR-15 rifle that included a Three Percenter emblem and the words, "WILL NOT COMPLY."

Stockton took office on the Vacaville City Council in January. During public comment at the first meeting since the article was published, speakers referenced the report and questioned Stockton's fitness to lead. Supervisors Mitch Mashburn and Joe Vasquez, who endorsed Stockton for the council, did not respond to questions about whether they stood by their endorsements. Mashburn is a former Solano County sheriff's lieutenant and Vacaville councilmember.

Pratt did not respond to questions from Open Vallejo either before or after publication, but provided a statement to other media outlets which echoed Ferrara's characterization that he only meant to show support for the Second Amendment by sharing symbols associated with the Three Percenters.

Pratt said that in 2016, when he posted a photo of the gun rack he made for Stockton with the hashtag "#3percenter," he believed the Three Percenter movement was "strictly in support of the 2nd Amendment and Pro-American — not in any way extremist anti-government views." Earlier that year, Three Percenter groups participated in an **armed standoff** with federal authorities in Oregon that left one man dead.

"I am disheartened that a photo taken in 2016 is now being used to link my family name to a radical attack on the US Capitol in 2021 and disparage work that I have done in the community trying to bring folks together," Pratt's statement read. Pratt first posted photos of the gun rack in 2016 and periodically reposted it for years, most recently in December 2018.



Federal Bureau of Investigation

FBI surveillance footage shows militant LaVoy Finicum moments before he is shot dead by two Oregon State Police officers during the 2016 armed occupation of the Malheur National Wildlife Refuge in Harney County, Oregon. Three Percenters armed with rifles took part in the standoff.

Ferrara did not respond to follow up questions from Open Vallejo about whether he plans to investigate potential extremist support within his agency or whether he is confident that his office can effectively investigate domestic terrorism involving the Three Percenters or other violent far-right groups.

Some proposed legislation could force Ferrara to take action.

In February, state Assemblymember Ash Kalra, D-San Jose, introduced a bill, **AB 655** that would require law enforcement agencies to investigate whether officers have participated in specified "hate group activities," including the display of symbols associated with hate groups on social media. If they had, it could disqualify them for employment.

Roseryn Bhudsabourg, a spokesperson for Kalra, said that such investigations are "critically needed" and "extremism, racism, and bias have no place among our law enforcement agencies and only contributes to the erosion of public confidence in the legitimacy and fairness of our justice system." She said that it appears the actions of the Three Percenters meet the definition of a hate group in the bill.

The state Department of Justice said in a statement that law enforcement officers found to be involved in violent extremism should be removed. "There's no place for violent extremism of any kind in law enforcement," the department said. "It erodes public trust and we look forward to working with our partners at the federal, state, and local level to address these recently-heightened concerns through all appropriate means, including potentially through officer decertification for serious misconduct in the future."

The gravity of the threat posed by extremist groups was again highlighted in January, when Napa County sheriff's deputies, working with the FBI, arrested an American Canyon man who allegedly possessed pipe bombs and dozens of firearms, including a belt-fed machine gun. Authorities **allege** that Ian Rogers, who owns a specialty auto repair in Napa, may have had intended to target state politicians and technology companies.

He also had a Three Percenter emblem on his car, investigators allege. In an affidavit, FBI Special Agent Stephanie Minor wrote of the emblem, "I know from my training and experience and my discussions with other agents experienced in domestic terrorism investigations that this sticker is commonly used by so-called 'Three Percenters,' people who ascribe to extreme anti-government, pro-gun beliefs."

Ferrara, while appearing to stand by his deputies, insisted in last month's prepared statement that extremist beliefs have no place in law enforcement.

"And if there is ever a time when a member of our office is displaying support to overthrow the government," he wrote, "it will be dealt with swiftly."

**SCOTT MORRIS**

Scott Morris is an independent journalist in Oakland and San Francisco covering police use of force, civil rights, protest and neighborhood news. In 2020 he was a reporter with ProPublica's Local Reporting Network based at the Bay City News Foundation.

MORE BY SCOTT MORRIS

© 2024 Copyright 2023 Informed California Foundation.
Proudly powered by Newspack by Automattic

mobile


FedEx® Tracking     Track Another Shipment    Local Scan Time ⌄    Help



SHOPRUNNER by **FedEx.**
READY TO SHOP AGAIN? SAVE ON YOUR NEXT ORDER.     SHOP NOW

**DELIVERED**

## Tuesday
3/26/24 at 8:54 AM

Signed for by: S.FRANK

⬇ **Obtain proof of delivery**

Want updates on this shipment? Enter your email and we will do the rest!

| YOUR EMAIL | |
| --- | --- |

**SUBMIT**

**MORE OPTIONS**

**DELIVERY STATUS**
Delivered ✅

🖶 Report missing package

**TRACKING ID**
272613290439  ✏ ⭐



**FROM**
Newport Beach, CA US
Label Created
3/25/24 7:00 PM

**WE HAVE YOUR PACKAGE**
IRVINE, CA
3/25/24 7:04 PM

**ON THE WAY**
MENLO PARK, CA
3/26/24 8:21 AM

**OUT FOR DELIVERY**

**DELIVERED**
MENLO PARK, CA US
Delivered
3/26/24 at 8:54 AM

⬇ View travel history

## Shipment facts

📦 **Shipment overview**

| TRACKING NUMBER | 272613290439 |
| --- | --- |
| DELIVERED TO | FedEx Location |
| SHIP DATE ⓘ | 3/25/24 |
| STANDARD TRANSIT ⓘ | 3/26/24 before 5:00 PM |
| DELIVERED | 3/26/24 at 8:54 AM |

🚚 **Services**

| SERVICE | FedEx Standard Overnight |
| --- | --- |
| TERMS | Shipper |
| SPECIAL HANDLING SECTION | Deliver Weekday |

🏷 **Package details**

| WEIGHT | 2 lbs / 0.91 kgs |
| --- | --- |
| TOTAL PIECES | 1 |
| TOTAL SHIPMENT WEIGHT | 2 lbs / 0.91 kgs |
| PACKAGING | FedEx Envelope |

↑ Back to top

## Travel history

| SORT BY DATE/TIME | TIME ZONE |
| --- | --- |
| Ascending ⌄ | Local Scan Time ⌄ |

| Monday, 3/25/24 | 5:00 PM | Picked up | RANCHO SANTA MARGARITA, CA |
| --- | --- | --- | --- |
| | | At FedEx Office | |
| | 7:00 PM | Shipment information sent to FedEx | |
| | 5:01 PM | Shipment arriving On-Time | RANCHO SANTA MARGARITA, CA |
| | 7:04 PM | Picked up | IRVINE, CA |
| | 8:19 PM | Left FedEx origin facility | IRVINE, CA |
| | 11:30 PM | Arrived at FedEx hub | OAKLAND, CA |
| Tuesday, 3/26/24 | 2:35 AM | Departed FedEx hub | OAKLAND, CA |
| | 3:28 AM | At destination sort facility | SAN FRANCISCO, CA |
| | 8:21 AM | At local FedEx facility | MENLO PARK, CA |
| | 8:54 AM | Delivered | MENLO PARK, CA |

↑ Back to top

## Watch list

You do not currently have any Watch list shipments.

**OUR COMPANY**
About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**
FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**
🌐 United States

**FOLLOW FEDEX**  ✉ f 𝕏 ⓘ ▶ ⓟ

ASK FEDEX

© FedEx 1995-2024     Site Map   Terms of Use   Privacy & Secur...